**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Block]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STANFORD CHEN, derivatively on behalf of SUPER MICRO COMPUTER, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES LIANG, YIH-SHYAN (WALLY) LIAW, DAVID WEIGAND, SCOTT ANGEL, ROBERT BLAIR, DANIEL FAIRFAX, SUSIE GIORDANO a.k.a. SUSAN MOGENSEN, JUDY LIN, SARA LIU, TALLY LIU, and SHERMAN TUAN,<br><br>Defendants,<br><br>and<br><br>SUPER MICRO COMPUTER, INC.,<br><br>Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

## INTRODUCTION

Plaintiff Stanford Chen ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Super Micro Computer, Inc. ("Super Micro" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Charles Liang ("Liang"), Yih-Shyan "Wally" Liaw ("Liaw"),

David Weigand ("Weigand"), Scott Angel ("Angel"), Robert Blair ("Blair"), Daniel Fairfax ("Fairfax"), Susie Giordano a.k.a. Susan Mogensen ("Giordano"), Judy Lin ("Lin"), Sara Liu ("S. Liu"), Tally Liu ("T. Liu"), and Sherman Tuan ("Tuan") (together, the "Individual Defendants," and collectively with Super Micro, "Defendants") for breaches of fiduciary duties, waste of corporate assets, unjust enrichment, gross mismanagement, abuse of control, and for violations of Sections 10(b), 20(a) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Liang, Liaw and Weigand for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Super Micro, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's current and former officers and directors from at least February 2, 2024, through June 29, 2026, both dates inclusive (the "Relevant Period").

2. Founded in 1993 by Defendants Liang, Liaw, and S. Liu, Super Micro is a leading designer, manufacturer, and distributor of enterprise information technology ("IT") systems used in data centers, cloud computing platforms, telecommunication networks, and artificial intelligence ("AI") applications. Central to the Company's growth strategy is its Data Center Building Block Solutions ("DCBBS") that "significantly reduces data center build time and enables full integration of AI computing, server, storage, networking, rack, cabling, liquid cooling, end-to-end management software, onsite deployment services, and ongoing maintenance." The capabilities derived from DCBBS allow the Company to integrate components developed by other companies into its systems.

3. Commonly integrated components in Super Micro systems include graphics processing units ("GPUs") created by Nvidia Corporation ("Nvidia"), often described as advanced AI accelerator chips. GPUs with advanced computing capabilities such as these are essential for the development and growth of AI. As such, these GPUs are subject to stringent controls by the U.S. government given its interest in protecting the domestic AI market and reducing national security threats that can arise from the vastly powerful computing capabilities such GPUs allow.

4. The export restrictions imposed to control the dissipation of this advanced AI technology were largely focused on sales to companies or other entities based in China and Hong Kong. These restrictions primarily targeted the export of software, hardware, and other technology used to manufacture, or produce certain chips, impacting a number of Super Micro's products. The Bureau of Industry and Security ("BIS") under the U.S. Department of Commerce began implementing licensing requirements for the export and reexport of AI technologies to China and Hong Kong starting in or around October 2022. Certain products are subject to these restrictions due to their abilities to "make a significant contribution to the military potential or nuclear proliferation of other nations" or because they could be "detrimental to the foreign policy or national security of the United States."

5. As stated by the Department of Justice ("DOJ") in its indictment against Defendant Liaw, by 2023, BIS tightened restrictions on the export and reexport of "high-performance computing chips and GPU-accelerated server systems" to entities in China. This included not only imposing new licensing requirements but also "extending controls" to protect against the transfer of protected technologies into China through third countries. DOJ further stated that "[t]hose regulations reflect a formal determination that the computing capabilities in advanced [AI] accelerator hardware are of sufficient strategic significance that their transfer to China poses an unacceptable risk to national security."

6. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Super Micro, willfully or recklessly made and/or caused the Company to engage in various forms of conduct that violated U.S. export control regulations and, *inter alia*, resulted in the indictment of a member of the Company's Board of Directors (the "Board") and other Super Micro affiliates. Specifically, the Individual Defendants willfully or recklessly caused the Company to: (1) rehire Defendant Liaw

despite known risks; (2) allow Defendant Liaw and other Super Micro employees and affiliates to violate U.S. export laws by diverting restricted GPUs to China; and (3) allow Defendant Liaw and other Super Micro employees and affiliates to pressure Super Micro's compliance team to approve such shipments despite knowing that the servers would be diverted to China (the "Diversion Misconduct").

7. Throughout the Relevant Period, the Individual Defendants represented to investors the strength and sustainability of the Company's sales and growth figures. However, during that same period, the Company had become increasingly reliant on sales of systems integrating Nvidia GPUs to China-based entities. For example, in an August 6, 2024 earnings call to discuss the financial results for the quarterly period and fiscal year ended June 30, 2024 (the "Q4 2024 Earnings Call")[1], Defendant Liang attributed the Company's "***robust growth***" as being "***driven by our technology and product leadership in the AI infrastructure market, especially with generative AI training and inferencing.***"[2]

8. Similarly, in an earnings call hosted on May 6, 2025 discussing the financial results of the third quarter of the 2025 Fiscal Year, Defendant Weigand stated that "China continued to represent less than 1% of sales in Q3."

9. However, the truth began to emerge on March 19, 2026, when the DOJ announced the unsealing of an indictment (the "Federal Indictment") against three Super Micro affiliates, including Defendant Liaw, for their involvement in a "scheme to divert massive quantities of servers housing U.S. artificial intelligence technology to customers in China" in violation of U.S. export control laws (the "Indictment Announcement"). The Indictment Announcement alleged billions of dollars in sales recorded by Super Micro were made in violation of U.S. export control regulations.

10. On this news, the price per share of Super Micro stock fell $10.26, or roughly 33.3%, from a closing price of $30.79 per share on March 19, 2026, to close at $20.53 per share on March 20, 2026.

11. The truth would not fully emerge until June 29, 2026, when multiple media outlets announced that the Taiwanese government had raided the Company's offices in Taiwan, and that the

---

[1] Super Micro's fiscal year does not mirror the calendar year, but instead starts on July 1, and ends on June 30 each year. For the period between July 1, 2023 and June 30, 2024, the "2024 Fiscal Year." For the period between July 1, 2024 and June 30, 2025, the "2025 Fiscal Year." For the period between July 1, 2025 and June 30, 2026, the "2026 Fiscal Year."

[2] All emphasis herein is added unless stated otherwise.

Keelung District Prosecutors' Office was investigating nine individuals for allegedly trans-shipping dozens of Company servers to China. Of these nine individuals, four were revealed to be Super Micro employees.

12. On this news, the price per share of Super Micro stock fell $2.48, or roughly 8.1%, from a closing price of $30.63 per share on June 26, 2026, to close at $28.15 per share on June 29, 2026.

13. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Super Micro's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Diversion Misconduct; (2) a substantial portion of the sales of the Company's servers, which contained U.S. AI technology, were diverted to customers based in China; (3) the foregoing sales and transactions were made in violation of U.S. export control laws and regulations; (4) as a result of the Diversion Misconduct, the Company's sales were artificially inflated at unsustainable numbers; and (5) the Company lacked adequate internal controls to ensure compliance with U.S. export laws. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

14. The Individual Defendants also breached their fiduciary duties by engaging in the Diversion Misconduct and failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

15. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

16. In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls while seven of the Individual Defendants engaged in lucrative insider trading, reaping combined personal profits of ***approximately $50.6 million***.

17. Moreover, the Individual Defendants caused the Company substantial harm by causing it to repurchase its own shares at artificially inflated prices. In total, the Company spent an aggregate amount

of approximately $200 million to repurchase approximately 4.9 million shares of its own common stock at artificially inflated prices from February 2024 to March 2026. In total, this caused the Company to overpay for repurchases of its own stock by approximately $62.3 million.

18. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its former Senior Vice President of Business Development to a consolidated federal securities fraud class action lawsuit in the United States District Court for the Northern District of California (the "Securities Class Action"), all of which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

19. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendant Liang's, Defendant Liaw's, and Defendant Weigand's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and there not being disinterested and/or independent directors, a majority of Super Micro's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

24. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

25. Plaintiff currently holds 210 Super Micro shares, having first purchased in September 2021, and has continually held Company common stock at all relevant times.

### Nominal Defendant Super Micro

26. Super Micro is a Delaware corporation with its principal executive offices at 980 Rock Avenue, San Jose, California 95131. Super Micro's common stock trades on the NASDAQ Global Select Market ("Nasdaq") under the ticker symbol "SMCI".[3]

### Defendant Liang

27. Defendant Liang cofounded the Company and has served as its President, CEO, and as the Chairman of the Board since September 1993. Defendant Liang is married to Defendant S. Liu.

[3] The Company completed a 10-1 forward split of its common stock. Super Micro shares began trading on a split-adjusted basis on October 1, 2024.

28. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Liang made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| May 14, 2025 | 184,694 | $44.98 | $8,307,222 |
| May 14, 2025 | 15,306 | $44.56 | $682,094 |
| June 18, 2025 | 300,000 | $45 | $13,500,000 |
| July 28, 2025 | 200,000 | $60 | $12,000,000 |

Thus, in total, before the fraud was exposed, he sold 700,000 shares of Company common stock on inside information, for which he received approximately $34.5 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

29. The Schedule 14A the Company filed with the SEC on March 3, 2026 (the "2026 Proxy Statement") stated the following about Defendant Liang:

> *Charles Liang* founded Supermicro and has served as our President, Chief Executive Officer and Chairman of the Board since our inception in September 1993. Mr. Liang has been developing server and storage system architectures and technologies for the past three decades. From July 1991 to August 1993, Mr. Liang was President and Chief Design Engineer of Micro Center Computer Inc., a high-end motherboard design and manufacturing company. From January 1988 to April 1991, Mr. Liang was Senior Design Engineer and Project Leader for Chips & Technologies, Inc., a chipset technology company, and Suntek Information International Group, a system and software development company. Mr. Liang has been granted 23 U.S. server technology patents. Mr. Liang holds an M.S. in Electrical Engineering from the University of Texas at Arlington and a B.S. in Electrical Engineering from National Taiwan University of Science & Technology in Taiwan. Our Governance Committee concluded that Mr. Liang should serve on the Board based on his skills, experience and qualifications in managing technology businesses, his technical expertise, and his long familiarity with our company's business.

(Emphasis in original).

**<u>Defendant Liaw</u>**

30. Defendant Liaw was a co-founder of the Company and served as a Board member and in various executive roles from September 1993 to January 2018. These roles included: Vice President of International Sales from September 1993 to April 2014, Senior Vice President ("SVP") of International Sales from May 2014 to January 2018, and Corporate Secretary from 1993 to January 2018. Defendant Liaw resigned from Super Micro in January 2018 following an Audit Committee investigation conducted

in response to material weaknesses in the Company's internal financial reporting controls. After his resignation from Super Micro and temporary retirement, Defendant Liaw rejoined the Company as a consultant in 2021. In August 2022, Defendant Liaw returned to Super Micro as a full-time employee, serving as SVP of Business Development. In January 2024, Defendant Liaw was re-elected to the Board and served as a Company director and SVP of Business Development until March 20, 2026.

31. The 2026 Proxy Statement stated the following about Defendant Liaw:

> *Yih-Shyan (Wally) Liaw* co-founded Supermicro in September 1993 and was reappointed to our Board in December 2023. From our founding until January 2018, Mr. Liaw was an employee and held various executive positions at our company, including Senior Vice President of Worldwide Sales and Corporate Secretary. He was also a member of the Board from 1993 until January 2018. In January 2018, Mr. Liaw resigned from all his positions with our company, including from the Board, during a period when we were not current in our filings with the Securities and Exchange Commission. His resignation followed the completion of an Audit Committee investigation, in connection with a restructuring of our sales organization as part of our remediation of material weaknesses in our internal control over financial reporting. Mr. Liaw retired in February 2018 until June 2020, when he was named President of 2CRSi Corporation, a company headquartered in Strasbourg, France that develops, produces and sells high-performance customized, environmentally friendly servers. Mr. Liaw returned to our Company as a consultant in May 2021, advising us with respect to business development matters. In August 2022, Mr. Liaw returned to full-time employment with us as Senior Vice President, Business Development. In January 2024, Mr. Liaw was re-elected to a full three-year term on our Board. Mr. Liaw holds an M.S. in Computer Engineering from University of Arizona, an M.S. in Electrical Engineering from Tatung Institute of Technology in Taiwan, and a B.S. degree from Taiwan Provincial College of Marine and Oceanic Technology. Our Governance Committee concluded that Mr. Liaw should serve on the Board based on his technical expertise and his long familiarity with our company's business.

(Emphasis in original).

**<u>Defendant Weigand</u>**

32. Defendant Weigand has served as the Company's SVP and CFO since February 2021. Defendant Weigand previously served as the Company's Chief Compliance Officer ("CCO") from May 2018 to March 2026.

33. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Weigand made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| May 20, 2025 | 67,000 | $44.02 | $2,949,494 |
| September 3, 2025 | 24,700 | $40.28 | $995,025 |
| September 3, 2025 | 300 | $40.85 | $12,256 |
| September 15, 2025 | 25,000 | $45.14 | $1,128,500 |

Thus, in total, before the fraud was exposed, he sold approximately 117,000 shares of Company common stock on inside information, for which he received approximately $5.1 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

34. The 2026 Proxy Statement stated the following about Defendant Weigand:

> *David Weigand* has served as our Senior Vice President, Chief Financial Officer since February 2021 and as Chief Compliance Officer since May 2018. Prior to his employment with our company, Mr. Weigand was a Vice President at Hewlett Packard Enterprise (HPE) from November 2016 until April 2018 and served as Vice President, Tax at Silicon Graphics International, Inc., from September 2013 until its acquisition by HPE in November 2016. Prior to that he was Vice President, Chief Financial Officer of Renesas Electronics America, a semiconductor company formed by the merger of the semiconductor businesses of NEC Corporation, Hitachi and Mitsubishi Electric from October 2010 until April 2013, and Vice President, Controller of NEC Electronics America from October 2004 until September 2010. Mr. Weigand holds a M.S. degree in Taxation from the University of Hartford and a B.S. degree in Accounting from San Jose State University and is a Certified Public Accountant in California (Inactive).

(Emphasis in original).

**Defendant Angel**

35. Defendant Angel has served as a Company director since March 2025. In January 2026, Defendant Angel was appointed as Lead Independent Director. He also serves as a member of the Audit Committee.

36. The 2026 Proxy Statement stated the following about Defendant Angel:

> *Scott Angel* has been a member of our Board since March 2025. Mr. Angel spent over 37 years in the audit and assurance practice at Deloitte & Touche LLP ("Deloitte") including 25 years as an audit partner in Silicon Valley. He focused on serving clients in the technology industry and led the semiconductor industry practice from 1993 until his retirement in December 2017. During his career at Deloitte, he served a wide range of public and private technology companies and has experience working on risk and compliance issues. Mr. Angel is a CPA (inactive status) and a member of the AICPA. He received his Bachelor of Arts in Business Administration degree from the University of

> Washington. Our Governance Committee concluded that Mr. Angel should serve on the Board based on his financial literacy, his experience in auditing financial statements and internal controls, and his familiarity with technology businesses.

(Emphasis in original).

**Defendant Blair**

37. Defendant Blair has served as a Company director since December 2022. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee (the "Governance Committee").

38. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Blair made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 28, 2025 | 13,600 | $42.62 | $577,456 |
| February 28, 2025 | 5,860 | $42.85 | $251,101 |

Thus, in total, before the fraud was exposed, he sold approximately 19,460 shares of Company common stock on inside information, for which he received approximately $828,557 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

39. The 2026 Proxy Statement stated the following about Defendant Blair:

> *Robert Blair* has been a member of our Board since December 2022. Mr. Blair was President and Chief Executive Officer of ESS Technology, Inc., a fabless semiconductor company for 19 years from September 1999 through July 2018 where he also served as a director from September 1999 through August 2019. During this time, ESS Technology, Inc. was a publicly listed company on Nasdaq for 9 years. Mr. Blair has been a director of Pictos, Inc., a technology licensing company that owns a portfolio of fundamental CMOS imaging patents, since July 2008 where he also previously served as President and Chief Executive Officer between 2008 and 2013. His professional background also includes more than 35 years of experience in marketing, sales, engineering, operations, and general management, principally in the computer hardware, software, and semiconductor industries. His experience includes roles at Global Semiconductor Alliance, Logistix Corporation, and XEGMAG (a division of Xidex Corporation). Mr. Blair holds twelve issued U.S. patents plus additional patents worldwide and studied electrical engineering at Arizona State University and applied economics at the University of San Francisco. Our Governance Committee concluded that Mr. Blair should serve on the Board based on his familiarity with technology businesses, skills and experience with business operations at technology companies, and public company experience.

(Emphasis in original).

**Defendant Fairfax**

40. Defendant Fairfax served as a Company director from July 2019 to June 2025.

41. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Fairfax made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 1, 2024 | 300 | $881.88 | $264,564 |
| April 1, 2024 | 300 | $1,010 | $303,000 |
| May 1, 2024 | 300 | $777.36 | $233,208 |
| June 3, 2024 | 300 | $802 | $240,600 |

Thus, in total, before the fraud was exposed, he sold approximately 1,200 shares of Company common stock on inside information, for which he received approximately $1 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

42. The Schedule 14A the Company filed with the SEC on December 8, 2023 (the "2024 Proxy Statement") stated the following about Defendant Fairfax:

> *Daniel Fairfax* has been a member of our Board since July 2019. Mr. Fairfax served as Senior Vice President and Chief Financial Officer of Brocade Communications, a networking equipment company ("Brocade") from June 2011 to November 2017. Brocade was acquired by Broadcom in November 2017. Mr. Fairfax previously served as Brocade's Vice President of Global Services from August 2009 to June 2011 and Brocade's Vice President of Business Operations from January 2009 to August 2009. Prior to Brocade, Mr. Fairfax served as Chief Financial Officer of Foundry Networks, Inc., from January 2007 until December 2008. Foundry Networks was acquired by Brocade in December 2008. Earlier in his career Mr. Fairfax served in executive financial management and/or general management positions at GoRemote Internet Communications, Ironside Technologies, Acta Technology, NeoVista Software, Siemens and Spectra-Physics. He began his career as a consultant with the National Telecommunications Practice Group of Ernst & Young. Mr. Fairfax is a certified public accountant with an inactive license in California and holds an MBA degree from The University of Chicago Booth School of Business and a Bachelor of Arts degree, with a major in Economics, from Whitman College. Our Governance Committee concluded that Mr. Fairfax should serve on the Board based on his skills, experience, his financial literacy and his familiarity with technology businesses.

(Emphasis in original).

**Defendant Giordano**

43. Defendant Giordano has served as a Company director since August 2024. She also serves as the Chair of the Compensation Committee.

44. The 2026 Proxy Statement stated the following about Defendant Giordano:

> *Susan Mogensen (Susie Giordano)* has been a member of our Board since August 2024. Ms. Giordano is the Chief Legal Officer of Lime, which position she has held since September 2024. Ms. Giordano has over 25 years of experience advising executive management and boards of directors on a wide range of topics, including strategy, litigation, compliance, regulatory matters, corporate governance, ESG, executive compensation, financial reporting, crisis management, cybersecurity, human capital management, investor relations, M&A, securities, shareholder engagement, and treasury matters. Previously, she worked at Intel for approximately 11 years where she served most recently as general counsel (interim). At Intel, Ms. Giordano also held roles as corporate secretary and vice president and managing director of Intel Capital where she provided primary legal support to the president of Intel Capital, Intel's global investment organization that makes equity investments and handles acquisitions, divestitures and other strategic transactions. She had joined Intel Capital in 2011 as M&A counsel. Before joining Intel, Ms. Giordano spent three years as president and CEO at Deal Fusion, an M&A legal consulting firm, and five years at Sun Microsystems including as director of M&A and strategic investments. Earlier in her career she was an attorney with law firms Gunderson Dettmer and Brobeck Phleger & Harrison. Ms. Giordano also previously served as general counsel at Aeris IoT SaaS. She has a juris doctorate from the University of San Francisco, School of Law and a Bachelor of Arts in political science from California Polytechnic State University, San Luis Obispo. Our Governance Committee concluded that Ms. Giordano should serve on the Board based on her skills, experience and qualifications in business and corporate law, her legal expertise and her familiarity with technology businesses.

(Emphasis in original).

**<u>Defendant Lin</u>**

45. Defendant Lin served as a Company director from April 2022 until October 2026. She also served as the Chair of the Governance Committee.

46. The 2026 Proxy Statement stated the following about Defendant Lin:

> *Judy Lin* has been a member of our Board since April 2022. Ms. Lin is a retired executive who has 30 years of experience in the disk drive industry. She served as an Independent Board Director of MORESCO Corporation, a leading manufacturer of specialty chemicals based in Japan, from June 2014 to May 2022. Ms. Lin served as Vice President of Western Digital Media Operations, a leader in data infrastructure, from September 2007 until her retirement in September 2012. Prior to Western Digital, Ms. Lin served as Vice President at Komag Inc., a leading supplier of thin-film disks to the hard disk drive industry and held various management positions from April 1994 until Western Digital acquired Komag in September 2007. Before joining Komag, Ms. Lin was with IBM Almaden Research Center

Storage Systems Division for 11 years as a Senior Scientist from January 1983 to April 1994. Ms. Lin holds a MSc degree in Materials Science and Mineral Engineering from University of California, Berkeley where she was also a PhD candidate, and a BS in Chemical Engineering from National Cheng Kung University in Taiwan. Our Governance Committee concluded that Ms. Lin should serve on the Board based on her substantial leadership and management experience and, considering she is well versed in technology innovation, product development, engineering and global operations, she will add valuable perspective to the Board.

(Emphasis in original).

**Defendant S. Liu**

47. Defendant S. Liu is a co-founder and has served as a Company director since September 1993. Defendant S. Liu also currently serves as Super Micro's Senior Vice President, previously serving in multiple other roles throughout her tenure at Super Micro. These roles included: Treasurer from September 1993 to May 2019, Chief Administrative Officer from October 1993 to May 2019, and SVP of Operations from May 2014 to February 2018. She is also married to Defendant Liang.

48. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant S. Liu made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 29, 2024 | 15 | $831.02 | $12,465 |
| April 29, 2024 | 16 | $835.87 | $13,374 |
| April 29, 2024 | 15 | $837.01 | $12,555 |
| April 29, 2024 | 19 | $839.72 | $15,955 |
| April 29, 2024 | 16 | $841.64 | $13,466 |
| April 29, 2024 | 16 | $843.13 | $13,490 |
| April 29, 2024 | 16 | $848.01 | $13,568 |
| April 29, 2024 | 32 | $854.89 | $27,356 |
| April 29, 2024 | 16 | $858.49 | $13,736 |
| April 29, 2024 | 16 | $864.56 | $13,833 |
| April 29, 2024 | 16 | $866.60 | $13,866 |
| April 29, 2024 | 32 | $869.83 | $27,384 |
| April 29, 2024 | 16 | $872.30 | $13,957 |
| April 29, 2024 | 16 | $873.50 | $13,967 |
| April 29, 2024 | 32 | $875.35 | $28,011 |
| April 29, 2024 | 32 | $877.35 | $28,075 |
| April 29, 2024 | 16 | $878.14 | $14,050 |
| April 29, 2024 | 32 | $883.04 | $28,257 |
| April 29, 2024 | 32 | $887.19 | $28,390 |
| April 29, 2024 | 16 | $888.40 | $14,214 |
| April 29, 2024 | 32 | $889.87 | $28,476 |

| | | | |
|---|---|---|---|
| April 29, 2024 | 14 | $891.07 | $12,475 |
| April 29, 2024 | 16 | $829.50 | $14,280 |
| April 29, 2024 | 30 | $894.17 | $26,825 |
| February 26, 2025 | 46,293 | $50.17 | $2,322,566 |

Thus, in total, before the fraud was exposed, she sold 46,802 shares of Company common stock on inside information, for which she received approximately $2.8 million in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

49. The 2026 Proxy Statement stated the following about Defendant S. Liu:

> *Sara Liu* co-founded Supermicro in September 1993, has been a member of our Board since our inception in September 1993 and currently serves as our Co-Founder, Senior Vice President, and a director. She has held a variety of positions with the Company, including Treasurer from inception to May 2019, Senior Vice President of Operations from May 2014 to February 2018, and Chief Administrative Officer from October 1993 to May 2019. From 1985 to 1993, Ms. Liu held accounting and operational positions for several companies, including Micro Center Computer Inc. Ms. Liu holds a B.S. in Accounting from Providence University in Taiwan. Ms. Liu is married to Mr. Charles Liang, our Chairman, President and Chief Executive Officer. Our Governance Committee concluded that Ms. Liu should serve on the Board based on her skills, experience, her general expertise in business and operations and her long familiarity with our company's business.

(Emphasis in original).

**Defendant T. Liu**

50. Defendant T. Liu has served as a Company director since January 2019. Defendant T. Liu also serves as a member of the Compensation Committee and as the Chair of the Audit Committee.

51. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant T. Liu made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| May 30, 2024 | 500 | $839.17 | $419,586 |

Thus, in total, before the fraud was exposed, he sold 500 shares of Company common stock on inside information, for which he received approximately $419,586 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

52. The 2026 Proxy Statement stated the following about Defendant T. Liu:

> *Tally Liu* was appointed to our Board in January 2019. He has been retired since 2015. Prior to his retirement, Mr. Liu was Chief Executive Officer of Wintec Industries, a supply chain solutions company for high-tech manufacturers, from 2012 to 2015. Prior to Wintec, Mr. Liu served as Chairman of the Board and Chief Executive Officer of Newegg, Inc., an internet consumer technology retailer, from 2008 to 2010, and as President of Newegg in 2008. Prior to Newegg, Mr. Liu held various positions with Knight Ridder Inc., including Vice President, Finance & Advanced Technology and Vice President of Internal Audit. Mr. Liu served as President of the International Newspapers Financial Executives (INFE) for one year before it merged with other media associations. A Certified Public Accountant from 1982 to 2007, Mr. Liu is a member of the American Institute of Certified Public Accountants (AICPA) with retired status and was previously a member of the Florida Institute of Certified Public Accountants (FICPA). Mr. Liu is also a Certified Information System Auditor (CISA) and Certified Information Security Manager (CISM), with non-practice status, with the Information Systems Audit and Control Association (ISACA) and has also been certified in Control Self-assessment (CCSA) by the Institute of Internal Auditors (IIA). After earning his BA of Commerce from National Chengchi University, Taipei, Taiwan, and MBA from Florida Atlantic University, Mr. Liu received executive leadership training at the Stanford Advanced Finance Program in 1986 and at Harvard Business School in the Advanced Management Program (AMP) in 1998. Mr. Liu is not related to any member of our Board or any of our officers. Our Governance Committee concluded that Mr. Liu should serve on the Board based on his skills, experience, his financial literacy, and his familiarity with technology businesses.

(Emphasis in original).

**Defendant Tuan**

53. Defendant Tuan has served on the Company's Board since February 2007. Additionally, Defendant Tuan serves as a member of the Governance Committee and the Compensation Committee.

54. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Tuan made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 29, 2024 | 1,000 | $871.382 | $871,382 |
| February 29, 2024 | 125 | $872 | $109,000 |
| February 29, 2024 | 752 | $873.4265 | $656,817 |
| February 29, 2024 | 2,023 | $874.6534 | $1,769,424 |
| February 29, 2024 | 1,100 | $875.6918 | $963,261 |
| November 26, 2025 | 48,630 | $33 | $1,604,790 |

Thus, in total, before the fraud was exposed, he sold 53,630 shares of Company common stock on inside information, for which he received approximately $6 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

55. The 2026 Proxy Statement stated the following about Defendant Tuan:

> *Sherman Tuan* has been a member of our Board since February 2007. Mr. Tuan founded PurpleComm, Inc. (doing business as 9x9.tv), a platform for connected TV, where he served as Chief Executive Officer from January 2005 to January 2018 and Chairman of the Board from June 2003 to January 2018. From September 1999 to May 2002, he was a director of Metromedia Fiber Network, Inc., a fiber optical networking infrastructure provider, Mr. Tuan was also a co-founder of AboveNet Communications, Inc., an internet connectivity solutions provider, where he served as President from March 1996 to January 1998, Chief Executive Officer from March 1996 to May 2002 and director from March 1996 to September 1999. Mr. Tuan holds a degree in Electrical Engineering from Feng-Chia University in Taiwan. Our Governance Committee concluded that Mr. Tuan should serve on the Board based on his skills, experience and qualifications in managing technology businesses, his technical expertise, and his familiarity with our company's business.

(Emphasis in original).

**<u>Relevant Non-Parties</u>**

56. The amended complaint in the Securities Class Action incorporates statements from former employees of Super Micro who offered their experiences as confidential witnesses.[4] The following are former employees whose statements are referenced throughout this complaint before this Court.

***FE-1***

57. FE-1 served as a Sales Director for the Company between July 2023 and July 2025. In this role, FE-1 was responsible for acquiring new business as part of Sales Team #1, which accounted for approximately 80% of the Company's total sales.

58. FE-1 reported to Ally Nassar and Shadow Liu, who reported to Marcus Sylva, a SVP of Sales, who reported to SVP and Chief Growth Officer Cenly Chen ("Chen"), who reported directly to Defendant Liang.

***FE-2***

59. FE-2 served as a Sales Manager for Original Equipment Manufacturer and Business Development between March 2023 and July 2024. In this role, FE-2 would find new accounts for the Company while also managing the Company's Original Equipment Manufacturer business (which accounted for producing parts or products that would be used in the finished goods for other companies).

[4] All former employees are referred to as feminine to preserve their anonymity.

60. FE-2 reported to Senior Sales Manager Jessie Chou, who reported to Senior Sales Director Dave Dunkle, who reported to Chen.

***FE-3***

61. FE-3 worked for the Company between January and September 2025 as a Technical Accounting and SEC Reporting employee. In this role, FE-3 would review accounting matters, prepare financial statements, and review the Company's periodic filings to the SEC.

62. FE-3 reported to Kenneth Cheung, who reported to Defendant Weigand.

***FE-4***

63. FE-4 worked for the Company for several years until 2024 as a Director in sales.

64. During this time, FE-4 reported to a Company executive who in turn reported directly to Defendant Liang.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

65. By reason of their positions as officers, directors, and/or fiduciaries of Super Micro and because of their ability to control the business and corporate affairs of Super Micro, the Individual Defendants owed Super Micro and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Super Micro in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Super Micro and its shareholders so as to benefit all shareholders equally.

66. Each director and officer of the Company owes to Super Micro and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

67. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Super Micro, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

68. To discharge their duties, the officers and directors of Super Micro were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of

the Company.

69. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Super Micro, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

70. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

71. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Super Micro were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to

Super Micro's corporate governance and applicable codes of conduct and/or ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Super Micro conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Super Micro and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Super Micro's operations would comply with all applicable laws and Super Micro's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

72. Each of the Individual Defendants further owed to Super Micro and the shareholders the duty of loyalty requiring that each favor Super Micro's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

73. At all times relevant hereto, the Individual Defendants were the agents of each other and of Super Micro and were at all times acting within the course and scope of such agency.

74. Because of their advisory, executive, managerial, directorial, and controlling positions with Super Micro, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

75. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Super Micro.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

77. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; (ii) conceal adverse information concerning Super Micro's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

78. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is or was a director of the Company was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

79. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

80. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Super Micro and was at all times acting within the course and scope of such agency.

## CORPORATE GOVERNANCE

***Super Micro's Code of Business Conduct and Ethics***

81. Super Micro's Code of Business Conduct and Ethics (the "Code of Conduct") states that it has been adopted "for all of [the Company's] directors, officers and employees."

82. In a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct states that Super Micro "is obligated to comply with all applicable laws and regulations in all counties in which it operates." It further states:

> The Company is committed to full compliance with the laws and regulations of the cities, states and countries in which it operates. You must comply with all applicable laws, rules and regulations in performing your duties for the Company. Numerous federal, state and local laws and regulations define and establish obligations with which the Company, its employees and agents must comply. Under certain circumstances, local country law may establish requirements that differ from this Code. You are expected to comply with all local country laws in conducting the Company's business. If you violate these laws or regulations in performing your duties for the Company, you not only risk individual indictment, prosecution and penalties, and civil actions and penalties, you also subject the Company to the same risks and penalties. If you violate these laws in performing your duties for the Company, you may be subject to immediate disciplinary action, including possible termination of your employment or affiliation with the Company.

83. In a section titled "Full, Firm, Accurate, Timely and Understandable Disclosure," the Code of Conduct states:

All disclosure in reports and documents that the Company files with, or submits to, the SEC, and in other public communications made by the Company must be full, fair, accurate, timely and understandable. You must take all steps available to assist the Company in these responsibilities consistent with your role within the Company.

To ensure that the Company meets this standard, you (to the extent you are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with your duties. In particular, you are required to provide prompt and accurate answers to all inquiries made to you in connection with the Company's preparation of its public reports and disclosure. You are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self- regulatory organizations.

The Company's CEO and CFO are responsible for designing, establishing, maintaining, reviewing and evaluating on a quarterly basis the effectiveness of the Company's disclosure controls and procedures (as such term is defined by applicable SEC rules). The Company's CEO, CFO, Controller, General Counsel and such other Company officers designated from time to time by the Audit Committee of the Board of Directors shall be deemed the "Senior Officers" of the Company. Senior Officers shall take all steps necessary or advisable to ensure that all disclosure in reports and documents filed with or submitted to the SEC, and all disclosure in other public communications made by the Company is full, fair, accurate, timely and understandable.

84. In a section titled "Insider Trading," the Code of Conduct states:

You should never trade securities on the basis of confidential information acquired through your employment or fiduciary relationship with the Company.

You are prohibited under both federal law and Company policy from purchasing or selling Company stock, directly or indirectly, on the basis of material non-public information concerning the Company. Any person possessing material non-public information about the Company must not engage in transactions involving Company securities until this information has been released to the public. Generally, material information is that which would be expected to affect the investment decisions of a reasonable investor or the market price of the stock.

You must also refrain from trading in the stock of other publicly held companies, such as existing or potential customers or suppliers, on the basis of material confidential information obtained in the course of your employment or service as a director. It is also illegal to recommend a stock to (i.e., "tip") someone else, including family members, on the basis of such information or to otherwise disclose non-public financial information for personal financial benefit or to "tip" others who might make an investment decision based on this information.

> If you have a question concerning appropriateness or legality of a particular securities transaction, consult with the Compliance Officer or the General Counsel. Officers, directors and certain other employees of the Company are subject to additional responsibilities under the Company's insider trading compliance policy.

85. In a section titled "Conflicts of Interest and Corporate Opportunities," the Code of Conduct states, in pertinent part:

> You must avoid any situation in which your personal, family or financial interests conflict or even appear to conflict with the Company's interests. A conflict of interest occurs when your private interests interfere, or appear to interfere, with the interests of the Company as a whole. You owe a duty to the Company not to compromise the Company's legitimate interests and to advance such interests when the opportunity to do so arises in the course of your employment.
>
> You shall perform your duties to the Company in an honest and ethical manner. You shall handle all actual or apparent conflicts of interest between your personal and professional relationships in an ethical manner.
>
> You may not engage in activities that compete with the Company or compromise its interests. You should not take for your own benefit opportunities discovered in the course of employment that you have reason to know would benefit the Company….
>
> * * *
>
> Conflicts are not always clear-cut. If you become aware of a conflict described above or any other conflict, potential conflict, or have a question as to a potential conflict, you should consult with your manager or the Compliance Officer and/or follow the procedures described in Section X of the Code. If you become involved in a situation that gives rise to an actual conflict, you must inform your supervisor or the Compliance Officer of the conflict.

86. In a section titled "Fair Dealing," the Code of Conduct states the following:

> Our goal is to conduct our business with integrity.
>
> You should deal honestly with the Company's customers, suppliers, competitors and employees. Under federal and state laws, the Company is prohibited from engaging in unfair methods of competition, and unfair or deceptive acts and practices. You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing.

87. In a section titled "Reporting Violations of Company Policies and Receipt of Complaints Regarding Financial Reporting or Accounting Issues," the Code of Conduct states the following:

> You should report any violation or suspected violation of the Code to the appropriate Company personnel or via the Company's anonymous and confidential reporting procedures described below.
>
> The Company's efforts to ensure observance of, and adherence to, the goals and policies outlined in the Code mandate that you promptly bring to the attention of the Compliance Officer, any material transaction, relationship, act, failure to act, occurrence or practice that you believe, in good faith, is inconsistent with, in violation of, or reasonably could be expected to give rise to a violation of, the Code.
>
> You should also report any suspected violations of the Company's financial reporting obligations or any complaints or concerns about questionable accounting or auditing practices in accordance with the procedures set forth below.
>
> * * *
>
> - Internal investigation. When an alleged violation of the Code, applicable laws and/or governmental regulations is reported, the Company will investigate and determine, or designate appropriate persons to investigate and determine, the legitimacy of the reports. Any suspected violation should be immediately reported to the Compliance Officer; however, to the extent that the suspected violation involves the Compliance Officer, such suspected violation should be immediately reported to the Chair of the Audit Committee. The Compliance Officer or the Chair of the Audit Committee, as applicable, shall assess the situation and determine the appropriate course of action.
>
> - No fear of retaliation. The Company will not retaliate or permit any person to retaliate against you for reporting alleged violations while acting in good faith. If any person were to retaliate they may be subject to civil, criminal and administrative penalties, as well as disciplinary action, up to and including termination of employment.
>
> - Disciplinary Actions. If a violation has been reported to the Audit Committee or another committee of the Board, that committee shall be responsible for determining appropriate disciplinary action. If a violation has been reported to the Compliance Officer, the Compliance Officer after consultation with the Legal Department, shall be responsible for implementing the appropriate disciplinary action in accordance with the Company's policies and procedures for any employee who is found to have violated the Code. Any violation of applicable law or any deviation from the standards embodied in the Code will result in disciplinary action, up to and including termination of employment.

88. In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to engage in the Diversion Misconduct and to cause the Company to

issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including, but not limited to, breaches of fiduciary duty, gross mismanagement, unjust enrichment, waste of corporate assets, abuse of control, and violations of the Exchange Act. In violation of the Code of Conduct, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC.

***Audit Committee Charter***

89. Super Micro's Audit Committee Charter states that the primary purpose of the Audit Committee is to "oversee the accounting and financial reporting processes of the Company, the integrity of the financial reports and other financial information and the audits of the Company's financial statements."

90. In the section titled "Duties and Responsibilities," under the subheading titled "Oversight of the Company's Independent Auditor," the Audit Committee Charter states that the Audit Committee shall have the following responsibilities, in pertinent part:

> 1. The Committee shall be solely responsible for the appointment, compensation and retention of any independent auditor and any other registered public accounting firm engaged by the Company for the purpose of preparing or issuing an audit report or related work and shall be directly involved in the oversight of such engagement (including resolution of disagreements between management and the independent auditor regarding financial reporting), and shall ensure that each independent auditor shall report directly to the Committee.
>
> 2. The Committee will review and discuss with the Company's independent auditors (1) the auditors' responsibilities under generally accepted auditing standards and the responsibilities of management in the audit process, (2) the overall audit strategy, (3) the scope and timing of the annual audit, (4) any significant risks identified during the auditors' risk assessment procedures and (5) when completed, the results, including significant findings, of the annual audit.

91. In the same section, under the subheading titled "Review of Financial Reporting Policies and Processes," the Audit Committee Charter states the responsibilities of the Audit Committee are, in pertinent part:

1. Review and discuss with the independent auditor any audit problems or difficulties and management's response.

2. Review and discuss with management and the independent auditor the annual audited financial statements to be included in the Company's annual reports on Form 10-K, the quarterly financial statements to be included in the Company's quarterly reports on Form 10-Q, and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

3. Review and discuss with management press releases regarding the Company's financial results, as well as financial information and earnings guidance provided to securities analysts and rating agencies.

4. Review with management and the independent auditor any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

92. In the same section, under the subheading titled "Risk Management, Related Party Transactions, Legal Compliance and Ethics," the Audit Committee Charter states that the Audit Committee shall have the following authority and responsibilities:

1. Review any report on significant deficiencies in the design or operation of the Company's internal control structure and procedures for financial reporting ("Internal Controls") that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in the Internal Controls identified to the auditors, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Internal Controls.

2. Review, discuss and approve the internal audit function's (i) audit plan, (ii) all major changes to the audit plan, (iii) the scope, progress and results of executing the internal audit plan, and (iv) the annual performance of the internal audit function.

3. Periodically review and discuss with management and independent auditors the Company's disclosure controls and procedures and internal control over financial reporting as defined in applicable SEC rules.

4. Review, approve and oversee transactions between the Company and any "related party," as such term is defined in the rules of the Exchange and SEC rules, in accordance with the Company's related party transaction policies and procedures. In addition, the Board may delegate the Chair of the Committee the authority to pre-approve or ratify (as applicable) certain related party transaction. Such pre-approval or ratification must be reported to the Committee at the next regularly scheduled meeting.

5. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Adopt, as necessary, appropriate remedial measures or actions with respect to such complaints or concerns.

6. Review and investigate conduct alleged to be in violation of the Company's Code of Business Conduct and Ethics, and adopt as necessary or appropriate, remedial, disciplinary or other measures with respect to such conduct.

7. Periodically review and discuss with management the Company's major financial risk exposures, as well as other major current and emerging risk exposures, including but not limited to, operational risks, health and safety risks, technology, privacy and cybersecurity risks, and strategic risks, and the steps management has taken to monitor and control the exposures, including the Company's risk assessment and risk management guidelines, policies and procedures.

8. Prepare the audit committee report required by the rules of the SEC to be included in the Company's annual proxy statement.

93. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' schemes to engage in the Diversion Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. Also, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Furthermore, they failed to maintain internal controls.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

***Background of Super Micro***

94. Super Micro was founded in 1993 by Defendants Liang, Liaw, and S. Liu. The Company is an internationally recognized designer and manufacturer of IT infrastructure. As a total IT solutions manufacturer, Super Micro offers a variety of products and services including servers, AI systems, storage, IoT [internet of things] devices, switches, software, and, to assist in the implementation and utilization of these offerings, support. In 2016, Super Micro formed a joint venture with Fiberhome, to service technology companies located in China.

95. A vast majority of the Company's revenue is derived from the sale of server and storage systems, with approximately 96% of revenues stemming from server and storage systems sales in the 2025 Fiscal Year.[5] Central to the sale of many of these server and storage systems is the Company's integration of Nvidia GPUs. GPUs are extremely significant to the development and growth of AI due to their ability to perform technical calculations significantly faster and more efficiently than central processing units ("CPUs") alone.

96. Given the importance of GPUs, especially in the realm of AI, the U.S. government has developed a keen interest in controlling the exportation of such advanced computing commodities. The Federal Indictment highlights the particular significance of regulations pertaining to exports and re-exports of advanced AI technology to China, stating, "China has been executing a state-directed campaign to dominate global [AI] and has been using its exascale supercomputing capabilities for its military modernization efforts, development and deployment of advanced [AI] surveillance tools, and [AI] training capabilities."

97. Beginning in October 2022, BIS introduced licensing requirements asking exporters, such as Super Micro, to meet certain requirements satisfying the needs of the American marketplace prior to the exportation of specific GPUs to countries believed to pose a national security threat. Some of the advanced computing commodities directly implicated by these BIS licensing requirements are Nvidia B200, H100, and H200 GPUs which are commonly integrated into Super Micro's workload optimized systems.

98. By 2023, BIS implemented more stringent controls to address the risk of items passing through third countries into China, with the DOJ noting that China's possession of advanced AI technologies poses an "unacceptable risk" to U.S. national security. In January 2025, the BIS issued the AI Diffusion Rule which added additional licensing requirements for computing components for the use of AI.[6]

***The Company's History of Compliance Failures***

---

[5] As recorded in the Company's 2025 Form 10-K filed with the SEC on August 28, 2025.

[6] In May 2025, the BIS announced that that it would not enforce the AI Diffusion Rule and that it would issue a new rule in its replacement. The replacement rule has not yet been issued.

99. The Company has repeatedly had issues complying with export control laws. For example, in September 2006, the United States opened a criminal investigation into the Company. The investigation revealed that between 2001 and 2002, the Company was shipping hundreds of computer motherboards to an entity based in Dubai, which then diverted the motherboards to Iran in violation of BIS export rules.

100. More recently, in 2017, the Company was engaged in an accounting fraud which resulted in the Nasdaq delisting the Company from the market, the Company having to pay fines of $17.5 million, and Defendant Liang agreeing to reimburse approximately $2.1 million in stock sale profits and compensation pursuant to the clawback provisions of the Sarbanes-Oxley Act.

101. Specifically, the Company had announced in August 2017 that it would be unable to timely file its annual report on Form 10-K, only offering vague explanations for the delay. This delay ultimately continued through the Company's future periodic filings with the SEC, leading to Nasdaq delisting the Company in March 2019.

102. As would later be revealed, the reason the Company was unable to file its SEC filings was the result of accounting manipulation, with the SEC ultimately revealing that the Company had been "engaged in improper accounting—prematurely recognizing revenue and understating expenses from at least fiscal year ("FY") 2015 through FY 2017." The SEC further revealed that the Company had "improperly accelerated revenue recognition and reporting" by, *inter alia*, (i) recognizing revenue before goods were delivered to customers; (ii) sending products to customers before a specified delivery date; (iii) altering shipment terms to larger customers so that revenue may be recognized upon shipment, as opposed to when the products were delivered; (iv) recognizing revenue in sales to large distributors upon shipment instead of when the company received payment; and (v) withholding documentation from overseas customers to prevent the customers from taking possession of goods while still recognizing revenue. As a result of this scheme, the SEC concluded that the Company had improperly recognized hundreds of millions of dollars in revenue.

103. Upon the completion of an internal investigation by the Company, it was announced that several members of the Company's senior and executive management would be resigning, including Defendant Liaw.

***The Company Restructures How Defendant Liang is Compensated***

104. On March 2, 2021, the Company's Compensation Committee altered Defendant Liang's compensation, reducing his base salary from $522,236 to $1 per year and converting his compensation to performance-based stock options. Under this plan, if the Company hit certain revenue and stock price targets, Defendant Liang would receive the ability to purchase significant amounts of Company stock options.

105. In November 2023, the Compensation Committee updated the plan for Defendant Liang's compensation, raising the revenue and stock price targets significantly. To receive the option awards, Defendant Liang needed the Company to produce $13 billion, $15 billion, $17 billion, $19 billion, and $21 billion in revenue over the preceding four consecutive fiscal quarters. In addition, the Company's stock price targets were set at $45, $60, $75, $90, and $110 per share. According to the amended complaint in the Securities Class Action, on August 26, 2025, the Compensation Committee certified Defendant Liang's achievement of the $21 billion revenue milestone under his compensation plan, based on the Company's revenue for the four quarters ending March 31, 2025. The Company reported approximately $21.57 billion in revenue during those quarters, including approximately $1.73 billion in allegedly illicit sales to Obon. Thus, absent the revenue attributable to the alleged Diversion Misconduct, Defendant Liang would not have satisfied the $21 billion revenue milestone.

***Rehiring of Defendant Liaw and Continued Accounting Scandals***

106. Despite his involvement in the 2017 scandal, the Company chose to rehire Defendant Liaw, first as a consultant, in 2021. In August 2022, the Company rehired Defendant Liaw as a full-time employee.

107. FE-1 claimed that the decision to rehire Defendant Liaw was made by Defendant Liang. FE-1 claimed that this was due to Defendant Liaw's close relationship with Defendant Liang, as well as to drive increased sales, despite Defendant Liaw's history of sales-related misconduct.

108. FE-1 also noted that part of Defendant Liaw's previous termination agreement was that if Defendant Liaw was ever brought back into the Company, he was not allowed to work in sales. FE-1 went on to state that Defendant Liaw's employment in Business Development was interchangeable with sales

and that, during FE-1's tenure, Defendant Liaw managed sales in China, dealing with the Company's Chinese customers.

109. FE-3 noted that by rehiring Defendant Liaw, as well as several others who were involved in the 2017 scandal, it set a negative tone that impacted the Company's corporate governance, internal controls, and compliance procedures.

110. Hindenburg Research published a report on August 27, 2024, detailing a variety of allegations against Super Micro (the "Hindenburg Research Report"). The Hindenburg Research Report reported on allegations of irresponsible rehiring of employees, including Defendant Liaw, and a variety of export control failures, though it drew particular attention to restricted exports to Russia. Eventually, the Company revealed that in late 2024, it had received subpoenas from the DOJ and SEC in direct response to the allegations included in the Hindenburg Research Report.

111. Shortly after the filing of the Hindenburg Research Report, on August 28, 2024, the Company announced it would be unable to timely file its annual report on Form 10-K for the 2024 Fiscal Year. Notably, in its Notification of Late Filing on August 30, 2024, the Company stated that "In response to information that was brought to the attention of the Audit Committee of the Company's Board of Directors, the Board of Directors has formed a committee to review certain of the Company's internal controls and other matters."

112. The Company's independent auditor, Ernst & Young ("EY"), was in charge of evaluating the efficacy and oversight of the Company's internal export controls, having been retained in March 2023 to perform the Company's annual audit for the 2024 Fiscal Year.

113. On October 24, 2024, and publicly reported on October 29, 2024,[7] EY resigned as the Company's registered public accounting firm, citing "information that has recently come to our attention which has led us to no longer be able to rely on management's and the Audit Committee's representations[.]"

114. In a Form 8-K filed with the SEC on October 30, 2024, it was revealed that EY's concerns

[7] https://www.cnbc.com/2024/10/30/super-micro-auditor-resigns-after-raising-concerns-months-earlier.html

had been growing for months. Specifically, in July 2024, EY communicated to the Company's Audit Committee that it had "concerns about several matters relating to governance, transparency and completeness of communications to EY, and other matters pertaining to the Company's internal control over financial reporting." The 8-K went on to report that, following the creation of a Special Committee (comprised solely of Defendant Giordano) to review EY's concerns, the auditor had questions concerning "whether the Company demonstrates a commitment to integrity and ethical values" and "whether EY could rely on representations from certain members of management and from the Audit Committee."

115. Despite these public concerns, on November 5, 2024, the Company announced in a Form 8-K that the Special Committee had "completed its investigation based on a set of initial concerns raised by EY" and found "that there is no evidence of fraud or misconduct on the part of management or the Board of Directors."

116. On December 2, 2024, the Company released the Special Committee's findings in a Form 8-K. The 8-K revealed that the Special Committee's investigation "focused on the rehiring of nine individuals. . . who had previously resigned from the Company following" the 2017 scandal. The Special Committee allegedly found no evidence of wrongdoing, but still noted that there were "lapses, including in ensuring guardrails were always in place and observed." The Special Committee also found that Defendant Weigand, who had served as the Company's Chief Compliance Officer since 2018 and its CFO since 2021, "had primary responsibility for the process of rehiring these employees" and thus "primary responsibility for process lapses." As a result, the Special Committee recommended the Company remove Defendant Weigand and "appoint at the soonest practicable time a new CFO with extensive experience working as a senior finance professional at a large public company," and "appoint a Chief Accounting Officer, which will create an additional layer of accounting standards and oversight." Despite these findings and recommendations, Defendant Weigand continues to be the Company's CFO.

***The Company's Compliance Team was Structured in a Way to Allow for the Diversion Misconduct***

117. FE-1 noted that, in her time at the Company, the Company's compliance team was comprised of largely inexperienced junior employees. FE-1 further noted that the compliance function was focused mostly on the sales team, as opposed to the compliance team.

118. Similarly, FE-4 noted how the Company's compliance policies were done for show, noting that senior management controlled any information that was seen by the internal compliance department. Notably, FE-4 revealed that the Company's leadership would relay information verbally, so as to avoid creating documentary evidence of any misconduct.

***The Diversion Misconduct***

119. As the subject of intense U.S. export controls, shipments of systems integrating Nvidia GPUs are heavily regulated to protect national security interests and foreign policy. Failure to comply with BIS licensing requirements exposes companies and individuals to significant liability.

120. According to the Federal Indictment, through their respective roles at Super Micro, Defendant Liaw and the two others allegedly operated the scheme by engaging with a company based in Southeast Asia, referred to in the Federal Indictment as Company-1, and later revealed as Obon Corporation ("Obon"), a Thailand-based entity. The Federal Indictment alleged that Defendant Liaw would arrange for Obon to place orders for servers integrating Nvidia GPUs under the less stringent licensing requirements imposed onto Thailand. This was accomplished by having the servers be assembled in the U.S. and then shipped to the Company's facilities in Taiwan. The Company would then deliver the servers to Obon in Thailand, with Obon then rerouting the servers to Chinese purchasers.

121. Defendant Liaw and the other named individuals allegedly prepared false documents and records in order to show that Obon was indeed the end-user of the Super Micro systems, allowing them to bypass the export controls that barred the shipment of these systems to end-users in China.

122. However, as disclosed by the Federal Indictment, the Diversion Misconduct still continued. According to the Federal Indictment, towards the end of 2024, Defendant Liaw and his conspirators worked to increase the speed and size of the orders being diverted to China. For example, around December 14, 2024, Defendant Liaw texted one of his co-conspirators "Roughly how many you can take by January? Feb? March? April? Just roughly forecast will be fine ... Then we can propose to [Nvidia] with the way they can accept ... This is the only way to have [Nvidia] to promise the B200 allocation so far as I know..."

123. As discussed in the Federal Indictment, in April 2025, the Company's compliance team

conducted a compliance review of the Company's shipments to Obon, resulting in the temporary pause of shipments between Super Micro and Obon. In response, Defendant Liaw and his co-conspirators assisted employees at Obon in responding to the compliance team, with Defendant Liaw emphasizing that "You need to have strong and persuasive reasons to convince the [Super Micro's] staffs!" On April 18, 2025, the Company's compliance team released Company-1 from its review, with Defendant Liaw informing an Obon employee that "We will speed up the shipment right away! Please issue the B200 [purchase order] right away!"

124. Immediately thereafter, the Federal Indictment shows that the Company's shipments to Obon skyrocketed, with the Company selling approximately $510 million worth of Nvidia GPUs to Obon which were then diverted to China in April and mid-May 2025 alone.

125. The Federal Indictment further claims that in August 2025, the Company's compliance team again audited Obon. According to the Federal Indictment, Defendant Liaw's co-conspirators assisted Obon in setting up "dummy" servers to be used to deceive the compliance team regarding the number of servers currently in Obon's possession. The dummy servers were staged at warehouses rented by Obon, with the conspirators even going so far as to package the dummy servers in Super Micro labels and boxes. On or about August 14, 2025, one of Defendant Liaw's co-conspirators texted Defendant Liaw images and videos of the dummy servers, stating "2,107 units in three warehouses." In response, Defendant Liaw stated "That's spectacular!" Two days later, Defendant Liaw pushed for Obon to order additional servers.

126. As disclosed by the Federal Indictment, on approximately August 20, 2025, BIS informed the Company that it had reason to believe that Obon was diverting the Company's servers to China, resulting in BIS placing a compliance hold on the Company's shipments to Obon. BIS further informed the Company that it would be conducting a post-shipment verification ("PSV") of servers purchased by Obon.

127. The Federal Indictment alleges that in December 2025, in preparation for the BIS PSV, Obon again prepared dummy servers to take part in the PSV. In preparing the dummy servers, Defendant Liaw's co-conspirators unboxed the servers, used a hair dryer to remove and affix labels and serial number stickers to the boxes or to the servers themselves, and then repackaged the servers in Super Micro boxes,

as shown in the Federal Indictment:



128. According to the Federal Indictment, following BIS's investigation, with the results pending, Defendant Liaw again pushed Obon to place a new purchase order for Company servers. In response to a question from an Obon employee regarding "how do u want me to proceed with the PO [i.e ., purchase order] sir?" to which Defendant Liaw responded, "Exactly the same as before[.] Have you received the BIS OK letter?" The employee informed Defendant Liaw "Not yet[.] But spoke with Willy [i.e., TING-WEI "Willy" SUN, the defendant] ... He said he is optimistic," to which Defendant Liaw responded "Great!"

129. On March 19, 2026, the DOJ announced the indictment of three Super Micro affiliates for allegedly causing "the sale of at least approximately $2.5 billion worth" of Super Micro servers through a scheme that ultimately diverted these products to companies based in China in violation of the export control rules. Though Super Micro was not indicted, the Company's financials were heavily impacted by the alleged $2.5 billion in sales attributed to this scheme.

130. The following day, on March 20, 2026, Defendant Liaw announced that he had resigned from the Company's Board of Directors, effective immediately.

131. In addition to the scheme involving Obon, the Company also utilized a pass-through

company based in Taiwan called Flying Tiger Technology Co. ("Flying Tiger"). According to the amended complaint in the Securities Class Action, Taiwanese prosecutors allege that the Company's Taiwan sales personnel procured 130 GPU-equipped servers for diversion to customers in China. Specifically, the Super Micro employees involved in the scheme would procure the servers and divert them to end-users in China. In order to cover their tracks, the employees utilized Albatron to advance purchase funds so that Flying Tiger could offer the illusion that it was able to afford the servers.

132. Reports further indicate that much of the Flying Tiger scheme mirrored the Company's scheme with Obon, notably that Flying Tiger leased a warehouse to utilize as a staging area for the servers before passing them on.

133. On May 20, 2026, the Taiwanese authorities raided warehouses in Keelung, Taiwan, in which the authorities seized 50 GPU-equipped Super Micro servers. In connection with these raids, Taiwanese officials had detained three individuals in connection with the alleged illegal export of restricted AI servers to companies in China. The Taiwanese court conducting the detention hearings found substantial evidence that the individuals had committed the offenses, including the use of altered private documents and causing false information to be recorded in official documents.

134. As a result, with a reported selling price of approximately $500,000 per server, the 130 servers sold in 2026 represented approximately $65 million in sales revenue for the Company, with 74 servers successfully reaching Chinese buyers, while Taiwanese officials intercepted the remaining 56.

135. The Company first acknowledged the Taiwanese investigation to the public on May 28, 2026, when it issued a press release stating that in "collaboration with authorities in Taiwan resulted in the arrest of three suspects and the seizure of 50 servers that had been deceptively acquired after being sold by Supermicro to an authorized reseller."

136. Further, both FE-4 and FE-1 told of an incident in which Cenly Chen, a Company executive who managed the Company's relationship with NVIDIA, handed NVIDIA chips to a CoreWeave executive who was boarding a plane to China, and that Chen was forced to resign from her position with the Company after the Indictment.

**<u>False and Misleading Statements</u>**

***February 2, 2024 Form 10-Q***

137. On February 2, 2024, the Company filed its Form 10-Q with the SEC for the quarterly period ending December 31, 2023 (the "Q2 2024 10-Q"), signed by Defendants Liang and Weigand. Attached to the Q2 2024 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Liang and Weigand. The SOX certifications attested to the accuracy of the Q2 2024 10-Q, more specifically that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]"

138. The Q2 2024 10-Q incorporated by reference Part I, Item 1A "Risk Factors" of the Company's Form 10-K filed with the SEC on August 28, 2023 (the "2023 10-K"). Notably, the "Risk Factors" section of the 2023 10-K stated the following, *inter alia*:

> [W]e are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business . . . ***If we fail to comply*** with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, ***we may be subject*** to civil or criminal penalties.

***February 16, 2024 Bloomberg Interview***

139. On February 16, 2024, Defendant Liang gave an interview to *Bloomberg Technology*, which was published to Bloomberg's website titled "Super Micro CEO Sees Market Gains Amid Huge Stock Rally."

140. In response to the question, "You had to pull out your manufacturing from China previously . . . How do you see that restriction on supply and the ongoing relationship between the U.S. and China now and it affecting your business?" Defendant Liang stated, "We are [a] USA company, located in Silicon Valley . . . f***or sure we follow the national law. The company complies very well.***"

***February 22, 2024 Press Release***

141. On February 22, 2024, the Company issued a press release, which was also filed with the SEC as an attachment to Form 8-K that same day. The Form 8-K was signed by Defendant Liang.

142. The press release announced the Company was offering $1.73 billion in convertible senior notes pursuant to Rule 144A. The press release also incorporated the same risk factors as the 2023 10-K,

stating:

> [W]e are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business . . . ***If we fail to comply*** with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, ***we may be subject*** to civil or criminal penalties.

***March 19, 2024 Registration Statement***

143. On March 19, 2024, the Company filed a Registration Statement with the SEC. The registration statement was signed by Defendants Liang, Weigand, and Liaw.

144. The registration statement repeated the same "Risk Factors" as the 2023 10-K, stating:

> [W]e are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business . . . ***If we fail to comply*** with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, ***we may be subject*** to civil or criminal penalties.

***April 23, 2024 Reuters Article***

145. On April 23, 2024, Reuters published an article entitled, "China Acquired Recently Banned Nvidia Chips in Super Micro, Dell Servers, Tenders Show" (the "Reuters Article").

146. The Reuters Article stated that a variety of entities in China, including universities, government-owned tech investment firms, and state-run research centers, obtained advanced computer chips despite the U.S. government's bar on selling advanced chips to China. The Reuters Article further stated that, "***Super Micro said it complied with U.S. requirements on the sale and export of GPU systems to regions and parties that require licenses***."

147. The Reuters Article quoted a representative of Super Micro as stating, "***[i]f we become aware that a third party has exported or reexported without the required license, we investigate the matter and take appropriate action[.]***" Additionally, the Reuters Article quoted a letter sent by law firm Clare Locke on behalf of the Company which touted that the Company "'g***oes above and beyond what U.S. export restrictions require' by proactively taking steps to ensure its customers do not violate the curbs***."

***May 20, 2024 J.P. Morgan Global Technology Conference***

148. On May 20, 2024, Defendant Weigand represented the Company at the J.P. Morgan Global Technology Conference.

149. During his presentation, Defendant Weigand was asked "[h]ow should we think about the likelihood of share loss." Defendant Weigand responded by stating that the Company was "***gaining a lot of new customers right now*** … we're ***seeing a lot of development*** over in Europe, in the Middle East, ***as well as Asia … our Asia sales grew most recently*** . . . we're not concerned about losses at any particular customers. We have very good relationships with our customers."

***July 2, 2024 Wall Street Journal Article***

150. On July 2, 2024, the Wall Street Journal published an article titled "The Underground Network Sneaking Nvidia Chips Into China."

151. The article quoted the Company as stating, in response to the Wall Street Journal's inquiry, that the Company "***compl[ies] with U.S. export controls and act[s] if illicit behavior is discovered***."

***August 6, 2024 Earnings Call***

152. On August 6, 2024, the Company hosted the Q4 2024 Earnings Call.

153. During his prepared remarks on the Q4 2024 Earnings Call, Defendant Liang announced the Company had achieved a "record quarterly result of $5.31 billion" with "143% year-over-year growth." Defendant Liang continued, noting that in the 2024 Fiscal Year, the Company had "achieved $14.94 billion in revenue, a 110% year-over-year growth rate. To put this in perspective, our Q4 revenue has exceeded the full-year revenue of fiscal 2022." Defendant Liang attributed the "***robust growth***" as being "***driven by our technology and product leadership in the AI infrastructure market, especially with generative AI training and inferencing.***"

154. During his own prepared remarks on the Q4 2024 Earnings Call, Defendant Weigand noted that the "***[g]rowth was driven by strong demand*** for next generation air-cooled and direct liquid cooled rack scale AI GPU platforms."

155. In discussing the Company's sales, Defendant Weigand noted that "On a year-over-year basis, US revenues increased 94%, ***Asia increased 437%***, Europe increased 128%, and the rest of [the] world increased 386%. On a quarter-over-quarter basis, US revenues increased 20%, ***Asia increased 66%***, Europe increased 74%, and rest of the world increased 187%."

156. While presenting on the Q4 2024 Earnings Call, Defendants Liang and Weigand showed a presentation which included the following slide, noting that the Company received "Less than 1% of Total Revenue" from China:




***August 12, 2024 The Information Article***

157. On August 12, 2024, The Information published an article entitled, "Nvidia AI Chip Smuggling to China Becomes an Industry." The article discusses the growing relevance of smuggling activities surrounding advanced AI chips in light of the U.S. government's increasingly stringent export control policies.

158. A spokesperson for Super Micro was quoted in the article as stating, in pertinent part, that the Company "***follow[s] all US export control requirements on the sale, service, support, and export of GPU systems to regions and parties that require licenses under the Export Administration Regulations***." The article further quotes the Company spokesperson as stating that "***[i]f Supermicro becomes aware that a third party has exported or reexported without the required licenses, it investigates the matter and takes appropriate action.***"

***September 6, 2024 J.P. Morgan Report***

159. On September 6, 2024, J.P. Morgan published a report titled "Super Micro Downgrade to Neutral as Uncertainty of 10K Delay and Follow-up Response Will Drive Overhang."

160. Regarding discussions between J.P. Morgan and the Company, the report revealed that "Our discussion with the company following the announcement of the delay in the 10-K filing [has] indicated," with regard to export restrictions, "***there is a detailed process in place both from Super Micro (and Nvidia) to check customer background before approving orders***."

161. The report also noted that, in response to concerns about the impact of export restrictions to China, the Company indicated that "***sales to China have declined in recent years in terms of revenue mix and is only a low-single digit percentage of total company revenue***."

***November 5, 2024 Earnings Call***

162. On November 5, 2024, the Company hosted an earnings call with investors and analysts to discuss the financial results for the quarter ended September 30, 2024 (the "Q1 2025 Earnings Call").

163. During the Q1 2025 Earnings Call, one analyst asked Defendant Weigand about whether the Company had "any 10% customer exposures in the quarter and the upcoming quarter," and "what percent of overall revenue did the 10% customers represent in the September quarter?" Defendant Liang responded that "we will have 10% customers," before noting that "at the same time, ***we continue to gain more new customers, especially in [] Asia . . . we will be able to keep a healthy ratio***."

***December 2, 2024 Press Release***

164. On December 2, 2024, the Company issued a press release which it also filed with the SEC as an attachment to a Form 8-K that same day. The Form 8-K was signed by Defendant Liang.

165. The press release announced that the Company's Special Committee had "reviewed 11 specific export transactions noted by EY" and "also reviewed certain allegations of export control violations contained in a short-seller report released on August 27, 2024" and "***did not see any evidence suggesting that anyone at the Company tried to circumvent export control regulations or restrictions, or that anyone at the Company was aware that any of its products might be diverted to a prohibited end user or location***." The press release continued, noting that "the Special Committee concluded it appears

***the Company has implemented a reasonable program for compliance with applicable export control regulations***."

***December 19, 2024 The Information and Reuters Articles***

166. On December 19, 2024, both Reuters and The Information reported that the U.S. Department of Commerce had requested Nvidia to investigate how the chips it developed ended up in the hands of Chinese entities. Specifically, The Information published an article titled "U.S. Prompts Nvidia, Supermicro Probe Into How Chips Ended Up in China."

167. The Information article quoted a representative of the Company as stating that the Company "***follows all U.S. export control requirements on the sale and export" of Nvidia chips***," and "***[i]f we become aware that a third party has exported or reexported without the required licenses, we investigate and take appropriate action***."

168. Reuters also published an article titled "US prompts Nvidia probe into how chips ended up in China, The Information reports."

169. The Reuters article quoted a Company spokesperson as stating that "***Supermicro follows all U.S. export control requirements on the sale and export of GPU systems*** to regions and parties that require licenses under the Export Administration Regulations."

***January 2025 Export Compliance Policy***

170. On or about January 28, 2025, the Company released its Export Compliance Policy. The Export Compliance Policy states that it is the Company's policy to "***fully comply with all export and re-export control laws of the United States***."

171. The Export Compliance Policy provides further information on its scope, stating, "[i]t is the policy of Supermicro senior management that ***the company will fully comply with all U.S. government regulations concerning the export and reexport of commodities, software and technology***"; "[t]he company ***is committed to obtaining and adhering to all necessary export licenses and conditions for controlled items, technology, or software***"; and senior management will be responsible for annually communicating to employees that "***[u]nder no circumstances will a Supermicro transaction be undertaken in a manner contrary to U.S. export regulations***."

***February 25, 2025 Form 10-K***

172. On February 25, 2025, the Company filed its delayed annual report for 2024 Fiscal Year on Form 10-K with the SEC (the "2024 10-K"). The 2024 10-K was signed by Defendants Liang, Liaw, Weigand, Blair, Fairfax, Giordano, Lin, S. Liu, T. Liu, and Tuan. The 2024 10-K attached certifications pursuant to SOX signed by Defendants Liang and Weigand. The SOX certifications attested to the accuracy of the 2024 10-K, more specifically that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]"

173. The 2024 10-K stated the following regarding the Company's "Risk Factors":

> We are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business . . . ***If we fail to comply*** with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, ***we may be subject to civil or criminal penalties***.
>
> * * *
>
> We are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business . . . ***If we fail to comply*** with laws and regulations restricting dealings with sanctioned countries, companies and/or persons subject to restricted party lists or parties engaged in restricted end uses, ***we may be subject*** to enforcement actions, including civil or criminal penalties.

174. The 2024 10-K further stated that the Company's "products ***could*** be re-exported to sanctioned persons or countries or provided by our retailers to third persons in contravention of our requirements or instructions or the laws."

175. In the section titled Management's Discussion and Analysis, the 2024 10-K had the following table which identified the "percentages of net sales by geographic region for fiscal years 2024, 2023, and 2022 (dollars in millions)":

| | Years Ended June 30, | | | 2024 over 2023 Change | | 2023 over 2022 Change | |
|---|---|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | $ | % | $ | % |
| United States | $ 10,187.2 | $ 4,834.1 | $ 3,035.5 | $ 5,353.1 | 110.7 % | $ 1,798.6 | 59.3 % |
| *Percentage of total net sales* | 68.0 % | 67.9 % | 58.4 % | | | | |
| Asia | 2,912.6 | 1,050.8 | 1,139.9 | 1,861.8 | 177.2 % | (89.1) | (7.8)% |
| *Percentage of total net sales* | 19.4 % | 14.7 % | 21.9 % | | | | |
| Europe | 1,294.0 | 1,003.1 | 825.2 | 290.9 | 29.0 % | 177.9 | 21.6 % |
| *Percentage of total net sales* | 8.6 % | 14.1 % | 15.9 % | | | | |
| Others | 595.4 | 235.5 | 195.5 | 359.9 | 152.8 % | 40.0 | 20.5 % |
| *Percentage of total net sales* | 4.0 % | 3.3 % | 3.7 % | | | | |
| Total net sales | $ 14,989.2 | $ 7,123.5 | $ 5,196.1 | $ 7,865.7 | 110.4 % | $ 1,927.4 | 37.1 % |

176. In discussing the difference between the sales from the 2023 Fiscal Year to the 2024 Fiscal Year, the 2024 10-K stated that "The period-over-period increase in overall net sales ***is driven by an increase in demand from customers for GPU servers, HPC [high-performance computing], and rack-scale solutions which have higher ASPs [average selling price], especially for large enterprise and data center customers from the United States, Asia and Europe sales where they have experienced significant growth***. The period-over-period increase of net sales in Asia and Europe is ***mainly due to an increase in net sales in Singapore, Japan and United Kingdom***."

***February 25, 2025 Q1 Form 10-Q***

177. On February 25, 2025, the Company filed its quarterly report for the period ended September 30, 2024 on Form 10-Q with the SEC (the "Q1 2025 10-Q") which was signed by Defendants Liang and Weigand. Attached to the Q1 2025 10-Q were certifications pursuant to SOX signed by Defendants Liang and Weigand. The SOX certifications attested to the accuracy of the Q1 2025 10-Q, more specifically that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]"

178. In discussing the Company's "Risk Factors", the Q1 2025 10-Q incorporated by reference the Risk Factors from the 2024 10-K, noting that "[t]here have been no material changes in our risk factors as described in [the 2024 10-K]."

179. The Q1 2025 10-Q touted the Company's financial results for the preceding quarter and purported to describe the factors contributing to the Company's sales results. The Q1 2025 10-Q stated, in pertinent part:

| | Three Months Ended September 30, | | Change | |
|---|---|---|---|---|
| | 2024 | 2023 | $ | % |
| Server and storage systems | $ 5,747.8 | $ 1,966.6 | $ 3,781.2 | 192.3 % |
| *Percentage of total net sales* | 96.8 % | 92.8 % | | |
| Subsystems and accessories | $ 189.5 | $ 153.1 | $ 36.4 | 23.8 % |
| *Percentage of total net sales* | 3.2 % | 7.2 % | | |
| Total net sales | $ 5,937.3 | $ 2,119.7 | $ 3,817.6 | 180.1 % |

180. In discussing the difference in the first quarter results between the 2023 and 2024 Fiscal Years, the Q1 2025 10-Q stated that "The period-over-period increase in overall net sales is ***driven by an increase in demand from customers for GPU servers, HPC, and rack-scale solutions which have higher ASPs, especially for large enterprise and data center customers from the United States, Asia and Europe sales where they have experienced significant growth***. The period-over-period increase of net sales in Asia and Europe is ***mainly due to an increase in net sales in Singapore, Japan and United Kingdom***."

***February 25, 2025 Q2 Form 10-Q***

181. Also on February 25, 2025, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended December 31, 2024 (the "Q2 2025 10-Q") which was signed by Defendants Liang and Weigand. Attached to the Q2 2025 10-Q were certifications pursuant to SOX signed by Defendants Liang and Weigand. The SOX certifications attested to the accuracy of the Q2 2025 10-Q, more specifically that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]"

182. In discussing the Company's "Risk Factors", the Q2 2025 10-Q incorporated by reference the Risk Factors from the 2024 10-K, noting that "[t]here have been no material changes in our risk factors as described in [the 2024 10-K]."

183. The Q2 2025 10-Q touted the Company's quarterly financial results and purported to explain contributors of the Company's sales results. Specifically, the Q2 2025 10-Q stated, in pertinent part:

| | Three Months Ended December 31, | | Change | | Six Months Ended December 31, | | Change | |
|---|---|---|---|---|---|---|---|---|
| | 2024 | 2023 | $ | % | 2024 | 2023 | $ | % |
| Server and storage systems | $ 5,487.2 | $ 3,435.6 | $ 2,051.6 | 59.7 % | $ 11,234.9 | $ 5,402.2 | $ 5,832.7 | 108.0 % |
| *Percentage of total net sales* | 96.6 % | 93.7 % | | | 96.7 % | 93.4 % | | |
| Subsystems and accessories | $ 190.8 | $ 229.3 | $ (38.5) | (16.8)% | $ 380.3 | $ 382.4 | $ (2.1) | (0.5)% |
| *Percentage of total net sales* | 3.4 % | 6.3 % | | | 3.3 % | 6.6 % | | |
| Total net sales | $ 5,678.0 | $ 3,664.9 | $ 2,013.1 | 54.9 % | $ 11,615.2 | $ 5,784.6 | $ 5,830.6 | 100.8 % |

184. In discussing the difference in the second quarter results between the 2024 and 2025 Fiscal Years, the Q2 2025 10-Q stated that "The period-over-period increase in overall net sales is ***driven by an increase in demand from customers for GPU servers, HPC, and rack-scale solutions which have higher***

***ASPs, especially for large enterprise and data center customers from the United States, Asia and Europe sales where they have experienced significant growth***. The period-over-period increase of net sales in Europe and Asia is ***mainly due to an increase in net sales in the United Kingdom, Spain, Sweden and Singapore***."

***March 10, 2025 Fox Business Interview***

185. On March 10, 2025, Defendant Liang appeared in an interview with Fox Business.

186. In the interview, Defendant Liang was asked about whether "the troubles [were] behind Super Micro," to which he replied that the Company's auditor had "found everything is good" and that the Company "***[had] the matter all fixed and indeed nothing [was] really wrong***."

***April 24, 2025 Proxy Statement***

187. On April 24, 2025, the Company filed a Proxy Statement on Schedule 14A with the SEC (the "2025 Proxy Statement"). Defendants Liang, Tuan, T. Liu, Angel, Lin, S. Liu, Liaw, Blair, and Giordano solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

188. The 2025 Proxy Statement called for the Company's shareholders to, *inter alia*: (1) re-elect Defendants Blair and Giordano to the Board until the 2027 annual meeting of the stockholders; (2) vote on a non-binding advisory basis, the compensation of Super Micro's named executive officers; (3) ratify the appointment of BDO USA, P.C. as the Company's independent registered public accounting firm for the 2025 Fiscal Year; and (4) approve an amendment and restatement to Super Micro's Equity and Incentive Compensation Plan (the "2025 Amendment to the A&R Equity Plan") to, among other things, increase the number of shares reserved for issuance thereunder by 18,000,000 shares.

189. The 2025 Proxy Statement noted that if Super Micro shareholders voted to approve the 2025 Amendment to the A&R Equity Plan it would become effective immediately. Further, the 2025 Proxy Statement notes that the approval of the 2025 Amendment to the A&R Equity Plan will cause 18,000,000 shares to be made available under the A&R Equity Plan. Per the 2025 Proxy Statement, as of March 31, 2025, 2,652,165 shares were still available for grant under the prior Plan, meaning that if the 2025 Amendment to the A&R Equity Plan was approved, there would be a total of 20,652,165 shares

available for grant. The 2025 Proxy Statement states that non-employee directors, officers and other employees of the Company and its subsidiaries, and certain consultants and other service providers to the Company and its subsidiaries are eligible to participate in the Plan. The 2025 Proxy Statement further notes that if shareholders were to not approve the 2025 Amendment to the A&R Equity Plan, shares available for award would be fully utilized in April 2025, and the ability to offer equity awards is essential to its ability to attract and retain Super Micro's employees.

190. Regarding "Board Role in the Oversight of Risk," the 2025 Proxy Statement stated:

> The Board oversees our risk management activities, requesting and receiving reports from management. The Board conducts this oversight directly and through its committees. The Board has delegated primary responsibility for oversight of risks relating to financial controls and reporting to our Audit Committee. The Audit Committee also assists the Board in oversight of certain other risks, including internal controls and review of related party transactions. The Audit Committee reports to the full Board on such matters as appropriate.
>
> Our management, with oversight from our Compensation Committee, has reviewed our compensation policies and practices with respect to risk-taking incentives and risk management and does not believe that potential risks arising from our compensation polices or practices are reasonably likely to have a material adverse effect on our company.

191. Regarding Super Micro's Code of Ethics, the 2025 Proxy Statement stated:

> We have adopted a "Code of Business Conduct and Ethics" that is applicable to all directors, executive officers and employees and embodies our principles and practices relating to the ethical conduct of our business and our long-standing commitment to honesty, fair dealing and full compliance with all laws affecting our business. Our "Code of Business Conduct and Ethics" is available at https://ir.supermicro.com/governance/governance-documents/default.aspx. Any substantive amendment or waiver of the Code relating to executive officers or directors will be made only after approval by our Board of Directors and will be promptly disclosed on our website within four business days.

192. The 2025 Proxy Statement stated the Audit Committee's responsibilities, in relevant part, as:

> • Reviews and discusses with the independent auditors any audit problems, or difficulties and management's response to them, and all matters that the Public Company Accounting Oversight Board and the SEC require to be discussed with the committee;

• Reviews and discusses with management press releases regarding our financial results, as well as financial information and earnings guidance provided to securities analysts and rating agencies;

• Reviews and approves the planned scope of our annual audit;

***

• Reviews our financial statements and discusses with management and the independent auditors the results of the annual audit and the review of our quarterly financial statements;

• Reviews our critical accounting policies and estimates;

• Oversees the adequacy of our financial controls;

• Periodically reviews and discusses with management and the independent auditors our disclosure controls and procedures and our internal control over financial reporting;

• Reviews, discusses and approves the internal audit function's (i) internal audit plan, (ii) all major changes to the internal audit plan, (iii) the scope, progress and results of executing the internal audit plan, and (iv) the annual performance of the internal audit function;

• Reviews, approves and oversees all related party transactions;

• Establishes and oversees procedures for the receipt, retention and treatment of complaints regarding accounting, internal controls or auditing matters and oversees enforcement, compliance and remedial measures under our Code of Business Conduct and Ethics;

• Initiates investigations and hires legal, accounting and other outside advisors or experts to assist the Audit Committee, as it deems necessary to fulfill its duties;

• Periodically reviews and discusses with management our major financial risk exposures and steps management has taken to monitor and control the exposures, including our risk assessment and risk management guidelines and policies;

• Reviews and evaluates, at least annually, the adequacy of the Audit Committee charter and recommends any proposed changes to the Board for approval; and

• Periodically performs an evaluation of the Audit Committee's performance of its duties.

193. Defendants Liang, Tuan, T. Liu, Angel, Lin, S. Liu, Liaw, Blair, and Giordano caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was engaged in the Diversion Misconduct; (2) a substantial portion of the sales of the Company's servers, which contained U.S. AI technology, were diverted to customers based in China; (3) the foregoing sales and transactions were made in violation of U.S. export control laws and regulations; (4) as a result of the Diversion Misconduct, the Company's sales were artificially inflated at unsustainable numbers; and (5)

the Company lacked adequate internal controls to ensure compliance with U.S. export laws. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

194. The 2025 Proxy Statement also failed to disclose, inter alia, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

195. As a result of Defendants Liang, Tuan, T. Liu, Angel, Lin, S. Liu, Liaw, Blair, and Giordano causing the 2025 Proxy Statement to be false and misleading, the Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Blair and Giordano to the Board until the 2027 annual meeting of the stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) vote on a non-binding advisory basis, the compensation of Super Micro's named executive officers; (3) ratify the appointment of BDO USA, P.C. as the Company's independent registered public accounting firm for the 2025 Fiscal Year; and (4) approve the 2025 Amendment to the A&R Equity Plan.

196. As a result of shareholders approving the 2025 Amendment to the A&R Equity Plan, the amendment took effect immediately upon reaching shareholder approval on June 4, 2025. An additional 18,000,000 shares were made available under the A&R Equity Plan, meaning there were 20,652,165 shares available for grant under the A&R Equity Plan. The Individual Defendants, most of whom are directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2025 Proxy Statement and the shareholders approving the 2025 Amendment to the A&R Equity Plan. Moreover, the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2025 Amendment to the A&R Equity Plan in the future.

***May 6, 2025 Earnings Call***

197. On May 6, 2025, the Company hosted an earnings call to discuss its financial results for the third quarter of the 2025 Fiscal Year.

198. During his prepared remarks on the call, Defendant Liang stated that "***we successfully fulfilled our commitment to regain financial regulatory compliance***."

199. During the question-and-answer portion of the call, one analyst asked "AI diffusion rules, there's a lot of investor angst about that. How are you guys thinking about your visibility and how the order should flow through given AI diffusion [rules] could impact or possibly could impact your revenues?" Defendant Liang responded by stating that "***[a]t this moment, we see our demand continue to grow. And that's why we continue to expand our facilit[ies] in U.S.A., in Taiwan, in Malaysia. So overall, our technology [is] leading edge, especially, I mean we do continue to see the demand will continue to grow strongly***."

200. While speaking with analysts and investors on the call, Defendant Weigand highlighted how the Company's "Q3 2025 revenues were $4.6 billion," which were "up 19% year-over-year," and benefited from "***strengthened enterprise adoption of new AI and CPU platforms***." Defendant Weigand further noted that the Company had achieved the following for quarterly sales, "[b]y geography, the US represented 60% of Q3 revenues, Asia 30%, Europe 6% and the Rest of the World 4%", and the following for year-over-year sales, "On a year-over-year basis, US revenues increased 3%, ***Asia increased 77%***, Europe decreased 3% and the Rest of the World increased 83%." Regarding quarter-over-quarter sales, Defendant Weigand stated that "US revenues decreased 28%, ***Asia increased 76%***, Europe decreased 69% and the Rest of the World increased 45%."

201. Defendant Weigand notably de-emphasized the amount of revenue attributable to sales to companies based in China, stating that, "China continued to represent less than 1% of sales in Q3."

***May 12, 2025 Form 10-Q***

202. On May 12, 2025, the Company filed Form 10-Q with the SEC for the quarterly period ending March 31, 2025 (the "Q3 2025 10-Q") which was signed by Defendants Liang and Weigand. Attached to the Q3 2025 10-Q were certifications pursuant to SOX signed by Defendants Liang and Weigand. The SOX certifications attested to the accuracy of the Q3 2025 10-Q, more specifically that "the

financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]"

203. In discussing the Company's "Risk Factors", the Q3 2025 10-Q incorporated by reference the Risk Factors from the 2024 10-K, noting that "[t]here have been no material changes in our risk factors as described in [the 2024 10-K]."

204. The Q3 2025 10-Q affirmed previously reported financial results while purporting to state the Company's net sales by product type as well as the drivers of Super Micro's increase in net sales. Specifically, the Q3 2025 10-Q stated the following, in pertinent part:

| | Three Months Ended March 31, | | Change | | Nine Months Ended March 31, | | Change | |
|---|---|---|---|---|---|---|---|---|
| | 2025 | 2024 | $ | % | 2025 | 2024 | $ | % |
| Server and storage systems | $ 4,458.9 | $ 3,698.5 | $ 760.4 | 20.6 % | $ 15,693.8 | $ 9,100.7 | $ 6,593.1 | 72.4 % |
| *Percentage of total net sales* | 96.9 % | 96.1 % | | | 96.8 % | 94.5 % | | |
| Subsystems and accessories | $ 141.0 | $ 151.6 | $ (10.6) | (7.0)% | $ 521.3 | $ 534.0 | $ (12.7) | (2.4)% |
| *Percentage of total net sales* | 3.1 % | 3.9 % | | | 3.2 % | 5.5 % | | |
| Total net sales | $ 4,599.9 | $ 3,850.1 | $ 749.8 | 19.5 % | $ 16,215.1 | $ 9,634.7 | $ 6,580.4 | 68.3 % |

205. In discussing the difference in the third quarter results between the 2023 and 2024 Fiscal Years, the Q3 2025 10-Q stated that "[t]he $749.8 million increase in overall net sales is ***driven by an increase in demand from customers for GPU servers, HPC, and rack-scale solutions which have higher ASPs, especially for large enterprise and data center customers from Asia where these customers have experienced significant growth***. The $589.7 million increase of net sales in Asia is ***mainly due to an increase in net sales in Japan, and Thailand***."

206. The Q3 2025 10-Q further noted that "For the three months ended March 31, 2025 and 2024, 60.2% and 69.7% of the Company's revenues were from the United States, and ***14.2% and 1.5% of the Company's revenues were from Thailand, respectively***."

***July 24, 2025 Financial Times Article***

207. On July 24, 2025, the Financial Times published an article titled "Nvidia AI chips worth $1bn smuggled to China after Trump export controls."

208. The article stated that "[a]t least $1bn worth of Nvidia's advanced artificial intelligence processors were shipped to China in the three months after Donald Trump tightened chip export controls."

The article quoted a Company spokesperson as stating that the Company "'***complies with all US export control requirements on the sale and export of GPU systems***.'"

***August 5, 2025 Earnings Call***

209. On August 5, 2025, the Company hosted an earnings call to discuss the financial results for the fourth quarter of the 2025 Fiscal Year.

210. During the call, Defendant Weigand stated that "On a year-over-year basis, US revenues decreased 33%, ***Asia increased 91%***, Europe increased 66%, and rest of world decreased 3%. On a quarter-over-quarter basis, US revenues decreased 21%. ***Asia increased 78%***. Europe increased 196% and rest of world increased 53%."

211. In response to a question regarding "what is going to be the driver of the projected Q-over-Q uptick to the September quarter revenue," Defendant Weigand stated that "***we have a lot of customers that are building out a really good deployments . . . that's what gives us a guide to the first quarter***." Defendant Liang also noted that the Company was "***gaining many more customers in Europe, Middle East and Asia now . . . the near future should be pretty strong***."

***August 5, 2025 Reuters Article***

212. That same day, Reuters published an article titled "Two Chinese nationals in California accused of illegally shipping Nvidia AI chips to China."

213. The article reported that two individuals associated with the company ALX Solutions were indicted by the DOJ after they "exported [] advanced Nvidia chips and other technology to China from October 2022 through July 2025 without the required licenses from the U.S. Commerce Department." The article further claimed that ALX had acquired the materials "from . . . Super Micro Computer, declaring that the customers were in Singapore and Japan."

214. The article further identified the invoices for multiple ALX purchases of Super Micro products, including one order of $28.5 million.

215. A spokesperson for Super Micro was quoted in the article as stating that the Company was "***firmly committed to compliance with all U.S. export control regulations***."

***August 28, 2025 Form 10-K***

216. On August 28, 2025, the Company filed its annual report for the fiscal year ended June 30, 2025 on Form 10-K with the SEC (the "2025 10-K"). The 2025 10-K was signed by Defendants Liang, Liaw, Weigand, Angel, Blair, Giordano, Lin, S. Liu, T. Liu, and Tuan. The 2025 10-K attached certifications pursuant to SOX signed by Defendants Liang and Weigand which attested to the accuracy of the 2025 10-K, more specifically that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]"

217. In the "Risk Factors" section, the 2025 10-K stated the following:

> We are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business . . . ***If we fail to comply*** with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, ***we may be subject*** to civil or criminal penalties.
>
> * * *
>
> We are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business . . . ***If we fail to comply*** with laws and regulations restricting dealings with sanctioned countries, companies and/or persons subject to restricted party lists or parties engaged in restricted end uses, ***we may be subject*** to enforcement actions, including civil or criminal penalties.

218. The 2025 10-K affirmed the previously reported financial results and provided further information on the Company's net sales by product type as well as alleged drivers of Super Micro's net sales increase. Specifically, the 2025 10-K stated, in pertinent part:

| | Years Ended June 30, | | | 2025 over 2024 Change | | 2024 over 2023 Change | |
|---|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2023 | $ | % | $ | % |
| Server and storage systems | $ 21,311.6 | $ 14,185.2 | $ 6,569.8 | $ 7,126.4 | 50.2 % | $ 7,615.4 | 115.9 % |
| *Percentage of total net sales* | 97.0 % | 94.6 % | 92.2 % | | | | |
| Subsystems and accessories | $ 660.4 | 804.0 | 553.7 | (143.6) | (17.9)% | 250.3 | 45.2 % |
| *Percentage of total net sales* | 3.0 % | 5.4 % | 7.8 % | | | | |
| Total net sales | $ 21,972.0 | $ 14,989.2 | $ 7,123.5 | $ 6,982.8 | 46.6 % | $ 7,865.7 | 110.4 % |

219. In comparing the results between the 2024 Fiscal Year and 2025 Fiscal Year, the 2025 10-K stated: "[t]he year-over-year increase in total net sales is ***driven by an increase in demand from customers for GPU servers, HPC and rack-scale solutions which have higher average selling prices, especially from large enterprise and data center customers resulting in increased sales of*** 28.1% in the United States, ***85.9% in Thailand and Japan***, and 111.9% in the United Kingdom, Sweden, and Spain, ***where we have experienced significant growth***."

220. The 2025 10-K further stated that "[f]or the year ended June 30, 2025, ***59.4% and 10.9% of revenues were from the United States and Thailand, respectively***."

***November 7, 2025 Form 10-Q***

221. On November 7, 2025, the Company filed Form 10-Q with the SEC for the quarterly period ending September 30, 2025 (the "Q1 2026 10-Q"), signed by Defendants Liang and Weigand. Attached to the Q1 2026 10-Q were certifications pursuant to SOX signed by Defendants Liang and Weigand. The SOX certifications attested to the accuracy of the Q1 2026 10-Q, more specifically that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]"

222. The Q1 2026 10-Q incorporated by reference the same Risk Factors as the 2025 10-K.

***February 6, 2026 Form 10-Q***

223. On February 6, 2026, the Company filed Form 10-Q with the SEC for the quarterly period ending December 31, 2025 (the "Q2 2026 10-Q"), signed by Defendants Liang and Weigand. Attached to the Q2 2026 10-Q were certifications pursuant to SOX signed by Defendants Liang and Weigand. The SOX certifications attested to the accuracy of the Q2 2026 10-Q, more specifically that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]"

224. The Q2 2026 10-Q incorporated by reference the same Risk Factors as the 2025 10-K.

225. The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public in ¶¶ 137-186; 197-224 that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Diversion Misconduct; (2) a substantial portion of the sales of the Company's servers, which contained U.S. AI technology, were diverted to customers based in China; (3) the foregoing sales and transactions were made in violation U.S. export control laws and regulations; (4) as a result of the Diversion Misconduct, the Company's sales were artificially inflated at unsustainable numbers; and (5) the Company lacked adequate internal controls to ensure compliance with

U.S. export laws. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

***March 3, 2026 Proxy Statement***

226. On March 3, 2026, the Company filed the 2026 Proxy Statement with the SEC. Defendants Liang, Tuan, T. Liu, Angel, Lin, S. Liu, Liaw, Blair, and Giordano solicited the 2026 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

227. The 2026 Proxy Statement called for the Company's shareholders to, *inter alia*: (1) re-elect Defendants Liang, Tuan, and T. Liu to the Board until the 2028 annual meeting of the stockholders; (2) vote on a non-binding advisory basis, the compensation of Super Micro's named executive officers; (3) ratify the appointment of BDO USA, P.C. as the Company's independent registered public accounting firm for the 2026 Fiscal Year; and (4) approve an amendment and restatement to Super Micro's Equity and Incentive Compensation Plan (the "2026 Amendment to the A&R Equity Plan") to, among other things, increase the number of shares reserved for issuance thereunder by 15,000,000 shares.

228. The 2026 Proxy Statement noted that if Super Micro shareholders voted to approve the 2026 Amendment to the A&R Equity Plan it would become effective immediately. Further, the 2026 Proxy Statement notes that the approval of the 2026 Amendment to the A&R Equity Plan will cause 15,000,000 shares to be made available under the A&R Equity Plan. Per the 2026 Proxy Statement, as of January 31, 2026, 7,550,020 shares were still available for grant under the prior Plan, meaning that if the 2026 Amendment to the A&R Equity Plan was approved, there would be a total of 22,550,020 shares available for grant. The 2026 Proxy Statement states that non-employee directors, officers and other employees of the Company and its subsidiaries, and certain consultants and other service providers to the Company and its subsidiaries are eligible to participate in the Plan. The 2026 Proxy Statement further notes that if shareholders were to not approve the 2026 Amendment to the A&R Equity Plan, the Company may be forced to increase the cash compensation of employees and directors.

229. Regarding "Board Role in the Oversight of Risk," the 2026 Proxy Statement stated:

> The Board oversees our risk management activities, requesting and receiving reports from management. The Board conducts this oversight directly and through its committees. The Board has delegated primary responsibility for oversight of risks relating to financial controls and reporting to our Audit Committee. The Audit Committee also assists the Board

in oversight of certain other risks, including internal controls and review of related party transactions. The Audit Committee reports to the full Board on such matters as appropriate.

Our management, with oversight from our Compensation Committee, has reviewed our compensation policies and practices with respect to risk-taking incentives and risk management and does not believe that potential risks arising from our compensation polices or practices are reasonably likely to have a material adverse effect on our company.

230. Regarding Super Micro's Code of Ethics, the 2026 Proxy Statement stated:

We have adopted a "Code of Business Conduct and Ethics" that is applicable to all directors, executive officers and employees and embodies our principles and practices relating to the ethical conduct of our business and our long-standing commitment to honesty, fair dealing, accurate disclosures, and full compliance with applicable laws, rules, and regulations affecting our business. Our "Code of Business Conduct and Ethics" is available at https://ir.supermicro.com/governance/governance-documents/default.aspx. Any substantive amendment or waiver of the Code relating to executive officers or directors will be made only after approval by our Board of Directors and will be promptly disclosed on our website and filed with the SEC on Form 8-K within four business days.

231. The 2026 Proxy Statement stated the Audit Committee's responsibilities, in relevant part, as:

• Reviews and discusses with our independent auditors their responsibilities, audit strategy, scope and timing, identified risks, and audit results;

• Oversees the independent auditors' audit work and reviews and pre-approves all audit, audit-related and non-audit services that may be performed by them;

• Reviews and approves the financial statements to be included in our quarterly reports on Form 10-Q and annual reports on Form 10-K;

• Reviews and discusses with management press releases on financial results and financial information or earnings guidance shared with analysts and rating agencies;

***

• Review, in consultation with management, and the auditors (as appropriate), internal control over financial reporting and disclosure controls and procedures;

• Reviews, approves and oversees all related party transactions in accordance with our related party transaction policies and procedures;

• Establishes and oversees procedures for the receipt, retention and treatment of complaints regarding accounting, internal controls or auditing matters and oversees enforcement, compliance and remedial measures under our Code of Business Conduct and Ethics;

> • Initiates investigations and hires legal, accounting and other outside advisors or experts to assist the Audit Committee, as it deems necessary to fulfill its duties; [and]
>
> • Periodically reviews and discusses with management our major financial risk exposures, including cybersecurity events and steps management has taken to monitor and control the exposures, including our risk assessment and risk management guidelines and policies[.]

232. Defendants Liang, Tuan, T. Liu, Angel, Lin, S. Liu, Liaw, Blair, and Giordano caused the 2026 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was engaged in the Diversion Misconduct; (2) a substantial portion of the sales of the Company's servers, which contained U.S. AI technology, were diverted to customers based in China; (3) the foregoing sales and transactions were made in violation of U.S. export control laws and regulations; (4) as a result of the Diversion Misconduct, the Company's sales were artificially inflated at unsustainable numbers; and (5) the Company lacked adequate internal controls to ensure compliance with U.S. export laws. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

233. The 2026 Proxy Statement also failed to disclose, inter alia, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2026 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

234. As a result of Defendants Liang, Tuan, T. Liu, Angel, Lin, S. Liu, Liaw, Blair, and Giordano causing the 2026 Proxy Statement to be false and misleading, the Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Liang, Tuan, and T. Liu to the Board until the 2028 annual meeting of the stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) vote on a non-binding advisory basis, the compensation of Super Micro's named executive officers; (3) ratify the appointment of BDO USA, P.C. as the Company's independent registered public accounting firm for the 2026 Fiscal Year; and (4) approve the 2026 Amendment to the A&R Equity Plan.

235. As a result of shareholders approving the 2026 Amendment to the A&R Equity Plan, the amendment took effect immediately upon reaching shareholder approval on April 20, 2026. An additional

15,000,000 shares were made available under the A&R Equity Plan, meaning there were 22,550,020 shares available for grant under the A&R Equity Plan. The Individual Defendants, most of whom are directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2026 Proxy Statement and the shareholders approving the 2026 Amendment to the A&R Equity Plan. Moreover, the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2026 Amendment to the A&R Equity Plan in the future.

## The Truth Emerges

***March 19, 2026***

236. The truth began to emerge after the markets closed on March 19, 2026, when the DOJ released the Indictment Announcement and announced that Defendant Liaw had been arrested. The Indictment Announcement revealed the full extent of the Diversion Misconduct, noting that Defendant Liaw and his co-conspirators had utilized a "web of lies, obfuscation, and concealment—all to drive sales and generate revenues in violation of U.S. law," which "generate[d] billions of dollars in ill-gotten gains and pose[d] a direct threat to U.S. national security." The Indictment Announcement further stated that these actions "defrauded the United States."

237. The Federal Indictment alleges that Defendant Liaw and his co-conspirators had "caused the sale of at least approximately $2.5 billion worth" of Super Micro servers to Obon, which ultimately were then sold through to China.

238. On this news, the price per share of Super Micro stock fell $10.26, or roughly 33.3%, from a closing price of $30.79 per share on March 19, 2026, to close at $20.53 per share on March 20, 2026.

***June 9, 2026***

239. On June 9, 2026, the truth continued to emerge when the Company filed a Form 8-K with the SEC. The June 9, 2026 8-K revealed that the Company had updated its risk factors as disclosed in other SEC filings. Notably, the 8-K also revealed that "the Company received a subpoena from the SEC requesting the production of documents relating to certain customers, including one customer that is the

subject of the allegations in the Indictment, and the Company's controls and procedures." In addition, the 8-K also revealed that the Company had "also received a grand jury subpoena from the U.S. Attorney's Office for the Southern District of New York seeking documents and information relating to the individuals and facts referenced in the Indictment, as well as the Company's compliance program and internal controls, and related issues. The Company has also received other subpoenas, including one from the U.S. Attorney's Offices for the Eastern District of New York and one from Central District of California that predate the Indictment requesting documents and information relating to certain other customers."

240. The 8-K also noted that the Company had received "at least two subpoenas and one informal request relating to a certain customer implicated by the facts and circumstances that are also the subject of the Indictment." In receiving these subpoenas, the 8-K revealed that BIS "could seek to suspend, revoke or deny [the Company's] export privileges."

241. On this news, the price per share of Super Micro stock fell $11.37, or roughly 28%, from a closing price of $40.64 per share on June 9, 2026, to close at $29.27 per share on June 10, 2026.

***June 29, 2026***

242. The truth would not fully emerge until June 29, 2026, when multiple media outlets announced that the Taiwanese government had raided the Company's offices in Taiwan, as well as the residences of six individuals in connection. It was further reported that the Keelung District Prosecutors Office was investigating nine individuals for allegedly trans-shipping dozens of Company servers to China. Of these nine individuals, four were revealed to be Super Micro employees. Authorities also confirmed that some servers had already been successfully sent to companies in China, while approximately 50 additional servers had been seized before they left Taiwan.

243. On this news, the price per share of Super Micro stock fell $2.48, or roughly 8.1%, from a closing price of $30.63 per share on June 26, 2026, to close at $28.15 per share on June 29, 2026.

**Subsequent Developments**

244. On August 24, 2026, the Keelung District Prosecutors' Office announced criminal charges against eight individuals in connection with the Flying Tiger diversion scheme, including two employees

of Super Micro's Taiwan operations and one employee of Nvidia's Taiwan operations. A ninth individual was charged in a related case. Prosecutors alleged that the individuals used false documents to conceal the intended destination of servers equipped with restricted Nvidia GPUs, resulting in the diversion of 74 servers to customers in China, while another 56 were intercepted by Taiwanese customs officials.

245. On August 31, 2026, the Company filed its annual report on Form 10-K for the 2026 Fiscal Year (the "2026 10-K").

246. The 2026 10-K included an audit opinion from the Company's independent auditor, which revealed that "the Company did not maintain, in all material respects, effective internal control over financial reporting as of June 30, 2026, based on the COSO criteria." The audit further revealed that "The Company's information technology controls for certain systems that support some of the financial reporting processes did not operate for a sufficient period of time, and the Company did not perform controls in a consistent and timely manner to monitor user access to certain financial applications, system infrastructure and programs."

247. On September 8, 2026, Willy Sun, one of the co-conspirators in the Diversion Misconduct, pleaded guilty to charges in a Superseding Information, including one count of conspiracy to violate the Export Control Reform Act, one count of conspiracy to smuggle goods from the United States, and one count of conspiracy to defraud the United States.

248. Sun further pleaded guilty to an obstruction of justice charge on account of "delet[ing] an encrypted messaging application and its contents from his cellphone, with the intent to impede, obstruct, and influence an investigation by the United States Attorney's Office for the Southern District of New York," on the day the Indictment was unsealed.

## **REPURCHASES DURING THE RELEVANT PERIOD**

249. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $200 million to repurchase approximately 4.9 million shares of its own common stock at artificially inflated prices from February 2024 through March 2026.

250. According to the 2025 10-K, between June 1, 2025, and June 30, 2025, the Company

repurchased 4,891,171 shares of its own common stock at an average price per share of approximately $40.89, for a total cost to the Company of approximately $199,999,982.

251. As the Company's stock was actually worth only $28.15, the price at closing on June 29, 2026, the Company overpaid by approximately $62,313,519 for repurchases of its own stock between June 1, 2025, and June 30, 2025.

252. As such, the Company overpaid by approximately $62.3 million during the Relevant Period for repurchases of its own stock.

## INDIVIDUAL DEFENDANTS' KNOWLEDGE

253. The amended complaint in the Securities Class Action recounts statements from former Super Micro employees supporting an inference that the Company's leadership was aware of the Diversion Misconduct and the false and misleading nature of the Company's public statements during the Relevant Period.

254. For example, according to FE-1, Defendant Liang required the Company's sales employees to obtain his signed approval for all sales transactions, even those as low as $3,000, and that any customer evaluation or proof of concept worth $25,000 was also subject to Defendant Liang's sign off. FE-1 further stated that nothing left the Company without Defendant Liang's signature.

255. FE-3 corroborated this, noting that the Company was tightly controlled by Defendant Liang, and that Super Micro felt more like a founder-managed start-up company as opposed to a major public company. FE-3 further stated that the Company had a notable lack of internal governance and compliance systems.

256. FE-1 noted that whenever one of her teams handled projects for major customers, Defendant Liang was involved in the design of the project, attended meetings, and pushed the team to finish faster.

257. FE-3 revealed that Defendant Liang knew all of the Company's largest customers by heart. Based on FE-3's experience, most of the bigger deals and accounts are run through Defendant Liang, and Defendant Liang would look specifically at the economics of each deal.

258. Regarding claims that China accounted for less than 1% of the Company's sales, FE-1

stated that that was a lie. FE-1 reported that her sales team, Sales Team #1, accounted for the vast majority of the Company's revenue, and that Defendant Liang had told employees that other sales teams contributed very little.

259. In addition, the former employees noted that Defendant Liang would routinely track and lead weekly meetings with the Company's sales leaders and employees. FE-1 stated that Defendant Liang would lead mandatory all-Company meetings on Monday mornings, which all personnel were expected to attend either in person or by video.

260. FE-1 noted that Defendant Liaw would attend these meetings, and that Defendant Liang would frequently praise how Defendant Liaw was able to generate new sales.

261. FE-3 had regular meetings with Defendant Weigand in which they went over the Company's accounting status, any significant transactions, and audit status. FE-3 further noted that the revenue team would then review this information, before Defendant Weigand would report it to Defendant Liang in business review meetings. FE-3 further explained that the Company tracked revenue by customer in its SAP system and prepared quarterly reports identifying its largest customers, their locations, revenue and product concentrations, and historical revenue trends. Defendant Weigand and his team reviewed these reports in preparation for quarterly earnings calls, and either Defendant Weigand or Kenneth Cheung would have reviewed them with Defendant Liang. FE-3 also stated that the CFO's office reviewed deal pricing and payment terms and that the CFO would usually have to approve payment terms for significant new customers without an established history. FE-3 also reported that Obon was repeatedly discussed during the Company's accounting reviews in April and May 2025 because it was a relatively new customer generating substantial revenue. According to FE-3, those discussions concerned changes in revenue, customer concentration, and the impact on the Company's profitability, and involved Defendant Weigand and members of the accounting function in Asia. FE-3 stated that Weigand had a formal process for reporting this information to Defendant Liang.

262. Regarding Defendant Liaw, FE-1 noted that he held a great deal of power within the Company and was able to essentially do whatever he wanted. FE-1 also noted how the movement of GPUs had to be documented in writing, and that such documentation for GPU shipments made it implausible

that those at the Company would not know where the products were going.

263. FE-4 noted that Defendant Liaw's sales practices in Asia were known within the inner circle of the Company, stating that it was impossible that Defendant Liang would not know about what Defendant Liaw was doing, and Defendant Liaw did not act without getting a blessing from Defendant Liang. FE-4 reiterated that anything that had to do with sales was approved by Defendant Liang, and that Defendant Liang himself was personally involved with customer orders and pricing.

264. FE-4 also noted how Defendant Liang would closely monitor the Company's employees, maintaining logs of everyone who was going in and out daily, and had the Company's IT department set up monitoring systems so he could see how employees used their devices, including cell phones.

265. According to FE-2, Defendant Liang was personally involved in all new customer opportunities and required notice of all new deals. FE-2 further noted that, if the Company's sales to Thailand rose from 1% to 10% of total Company sales, it would indicate a new market that would be brought to Defendant Liang's attention.

266. FE-2 also noted that the Company internally tracked all of its deals through a SAP system which made deal information readily available. Further, the Company's sales were put through a review board run by the Company's finance department, which would review and approve the deals.

## DAMAGES TO SUPER MICRO

267. As a direct and proximate result of the Individual Defendants' misconduct, Super Micro has lost and will continue to lose and expend many millions of dollars.

268. Such losses include the approximately $62.3 million the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

269. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

270. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the

Individual Defendants based on the misconduct alleged herein, including amounts paid to outside lawyers, accountants, and investigators in connection thereto.

271. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

272. Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, in addition to lucrative insider trading conducted by seven of the Individual Defendants.

273. As a direct and proximate result of the Individual Defendants' conduct, Super Micro has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

274. Plaintiff brings this action derivatively and for the benefit of Super Micro to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors, and/or officers of Super Micro, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and the aiding and abetting thereof.

275. Super Micro is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

276. Plaintiff is, and has been at all relevant times, a shareholder of Super Micro. Plaintiff will adequately and fairly represent the interests of Super Micro in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

277. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

278. A pre-suit demand on the Board of Super Micro is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Liang, Angel, Blair, Giordano, S. Liu, T. Liu, and Tuan (the "Director-Defendants"), and non-party Shesha Krishnapura (with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

279. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to engage in and/or cause the Company to engage in the Diversion Misconduct and to make false and misleading statements and omissions of material fact, and as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by ***approximately $62.3 million*** for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

280. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Super Micro to issue materially false and misleading statements. Specifically, the Director-Defendants caused Super Micro to issue false and misleading statements which were intended to make Super Micro appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

281. In addition, the Director-Defendants caused the 2025 Proxy Statement to call for a shareholder vote to approve the 2025 Amendment to the A&R Equity Plan, which increased the amount of shares available under the A&R Equity Plan by 18,000,000 shares. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2025 Amendment to the A&R Equity Plan, which they would not have approved had they been informed about the Individual

Defendants' misconduct. Prior to the Company's 2025 Annual Meeting of Stockholders on June 4, 2025, there were 2,652,165 shares available for distribution under the A&R Equity Plan. After the shareholders voted to approve the 2025 Amendment to the A&R Equity Plan, there were an additional 18,000,000 shares available for issuance under the A&R Equity Plan. Thus, the Individual Defendants received material personal benefits that they otherwise would not receive but for the issuance of the false and misleading 2025 Proxy Statement and the shareholders approving the 2025 Amendment to the A&R Equity Plan. For these reasons too, demand on the Director-Defendants is futile and, therefore, excused.

282. In addition, the Director-Defendants caused the 2026 Proxy Statement to call for a shareholder vote to approve the 2026 Amendment to the A&R Equity Plan, which increased the amount of shares available under the A&R Equity Plan by 15,000,000 shares. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2026 Amendment to the A&R Equity Plan, which they would not have approved had they been informed about the Individual Defendants' misconduct. Prior to the Company's 2026 Annual Meeting of Stockholders on April 20, 2026, there were 7,550,020 shares available for distribution under the A&R Equity Plan. After the shareholders voted to approve the 2026 Amendment to the A&R Equity Plan, there were an additional 15,000,000 shares available for issuance under the A&R Equity Plan. Thus, the Individual Defendants received material personal benefits that they otherwise would not receive but for the issuance of the false and misleading 2026 Proxy Statement and the shareholders approving the 2026 Amendment to the A&R Equity Plan. For these reasons too, demand on the Director-Defendants is futile and, therefore, excused.

283. Additional reasons that demand on Defendant Liang is futile follow. Defendant Liang has served the Company as its President, CEO, and Chairman of the Board since co-founding Super Micro in 1993. Defendant Liang is neither disinterested nor independent, and therefore, is incapable of considering demand because he, as the Company's President and CEO, is an employee of the Company, and thus derives substantially all of his income from his employment with Super Micro, thereby rendering him not independent. Defendant Liang is also married to Defendant S. Liu. As such, Defendant Liang cannot disinterestedly consider a demand to sue the directors, which include his wife. Defendant Liang solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the

re-election of Defendants Blair and Giordano, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Defendant Liang solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Tuan and T. Liu, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment to the A&R Equity Plan. As the Company's highest officer and a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Diversion Misconduct and to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made some of the false and misleading statements alleged herein. Defendant Liang also signed the false and misleading 10-Qs and 10-Ks issued throughout the Relevant Period as alleged herein. In addition, his insider sales during the Relevant Period, where he netted proceeds of approximately $34.5 million, further demonstrate his motive in facilitating and participating in the schemes. Additionally, under the 2025 and 2026 Amendments to the A&R Equity Plan, Defendant Liang is eligible to receive stock awards, thereby materially benefiting from the adoption of the 2025 and 2026 Amendments to the A&R Equity Plan. Moreover, Defendant Liang is named as a defendant in the Securities Class Action. For these reasons, Defendant Liang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

284. Additional reasons that demand on Defendant Angel is futile follow. Defendant Angel has served as a Company director since March 2025. He also serves as a member of the Audit Committee. Defendant Angel has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Diversion Misconduct and to make the false and misleading statements alleged herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Angel solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of

Defendants Blair and Giordano, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Defendant Angel solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Liang, Tuan, and T. Liu, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment to the A&R Equity Plan. Moreover, Defendant Angel signed the materially false and misleading 2025 10-K. Additionally, under the 2025 and 2026 Amendments to the A&R Equity Plan, Defendant Angel is eligible to receive stock awards, thereby materially benefiting from the adoption of the 2025 and 2026 Amendments to the A&R Equity Plan. For these reasons, too, Defendant Angel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

285. Additional reasons that demand on Defendant Blair is futile follow. Defendant Blair has served as a Company director since December 2022 and currently serves as a member of the Audit Committee and the Governance Committee. Defendant Blair has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Diversion Misconduct and to make the false and misleading statements alleged herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Blair solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendant Giordano, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Defendant Blair solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Liang, Tuan, and T. Liu, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment to the A&R Equity Plan. Moreover, Defendant Blair signed the materially false and misleading 2024 and 2025 10-Ks. In addition, his insider sales during the Relevant Period, where he netted proceeds of approximately $828,557, further demonstrate his motive in facilitating and participating in the schemes. Additionally, under the 2025 and 2026 Amendments to the A&R Equity Plan, Defendant

Blair is eligible to receive stock awards, thereby materially benefiting from the adoption of the 2025 and 2026 Amendments to the A&R Equity Plan. For these reasons, too, Defendant Blair breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

286. Additional reasons that demand on Defendant Giordano is futile follow. Defendant Giordano has served as a Company director since August 2024, and currently serves as the Chair of the Compensation Committee. Defendant Giordano has received and continues to receive compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Diversion Misconduct and to make the false and misleading statements alleged herein, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant Giordano solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and Defendant Blair, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Defendant Giordano solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Liang, Tuan, and T. Liu, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment to the A&R Equity Plan. Defendant Giordano also signed the materially false and misleading 2025 10-K. Additionally, under the 2025 and 2026 Amendments to the A&R Equity Plan, Defendant Giordano is eligible to receive stock awards, thereby materially benefiting from the adoption of the 2025 and 2026 Amendments to the A&R Equity Plan. For these reasons, too, Defendant Giordano breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

287. Additional reasons that demand on Defendant S. Liu is futile follow. Defendant S. Liu co-founded the Company and has served as a Company director since 1993. Defendant S. Liu has received and continues to receive compensation for her role as a director. Defendant S. Liu is married to Defendant Liang. Thus, as the Company admits, she is a non-independent director. Defendant S. Liu cannot

disinterestedly consider a demand to sue the directors, which include her husband. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Diversion Misconduct and to make the false and misleading statements alleged herein, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant S. Liu solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Blair and Giordano, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Defendant S. Liu solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Liang, Tuan, and T. Liu, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment to the A&R Equity Plan. Moreover, Defendant S. Liu signed the materially false and misleading 2024 and 2025 10-Ks. Additionally, under the 2025 and 2026 Amendments to the A&R Equity Plan, Defendant S. Liu is eligible to receive stock awards, thereby materially benefiting from the adoption of the 2025 and 2026 Amendments to the A&R Equity Plan. In addition, her insider sales during the Relevant Period, where she netted proceeds of approximately $2.8 million, further demonstrate her motive in facilitating and participating in the schemes. For these reasons, too, Defendant S. Liu breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

288. Additional reasons that demand on Defendant T. Liu is futile follow. Defendant T. Liu has served as a Company director since January 2019 and serves as the chair of the Audit Committee and as a member of the Compensation Committee. Defendant T. Liu has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Diversion Misconduct and to make the false and misleading statements alleged herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant T. Liu solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Blair and Giordano, allowing them to

continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Defendant T. Liu solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Liang and Tuan, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment to the A&R Equity Plan. Moreover, Defendant T. Liu signed the materially false and misleading 2024 and 2025 10-Ks. Additionally, under the 2025 and 2026 Amendments to the A&R Equity Plan, Defendant T. Liu is eligible to receive stock awards, thereby materially benefiting from the adoption of the 2025 and 2026 Amendments to the A&R Equity Plan. In addition, his insider sales during the Relevant Period, where he netted proceeds of approximately $419,586, further demonstrate his motive in facilitating and participating in the schemes. For these reasons, too, Defendant T. Liu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

289. Additional reasons that demand on Defendant Tuan is futile follow. Defendant Tuan has served as a Company director since February 2007, and currently serves as a member of the Compensation Committee and as a member of the Governance Committee. Defendant Tuan received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Diversion Misconduct and to make the false and misleading statements alleged herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Tuan solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Blair and Giordano, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Defendant Tuan solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Liang and T. Liu, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment to the A&R Equity Plan. Moreover, Defendant Tuan signed the materially false and misleading 2024 and 2025 10-Ks. Additionally, under the 2025 and 2026 Amendments to the A&R Equity

Plan, Defendant Tuan is eligible to receive stock awards, thereby materially benefiting from the adoption of the 2025 and 2026 Amendments to the A&R Equity Plan. In addition, his insider sales during the Relevant Period, where he netted proceeds of approximately $6 million, further demonstrate his motive in facilitating and participating in the schemes. For these reasons, too, Defendant Tuan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

290. Additional reasons that demand on the Board is futile follow.

291. The amended complaint in the Securities Class Action includes the testimony of "Former Director 1," who was interviewed by AlphaSense Expert Insights and served as an analyst and former sales director at the Company, overseeing the enterprise sales in the Midwest region for data center infrastructure and storage solutions, including channel/partner motions and complex deal executions. Former Director 1 claimed that "the executive board of directors will do whatever Charles [Liang] wants them to do, regardless of rules, regulations, and common sense. It's crazy." Given the control Defendant Liang, a primary wrongdoer, exerts over the Director-Defendants, the Director-Defendants cannot claim to be disinterested, and demand is excused as to them.

292. Defendants T. Liu (as Chair), Blair, and Angel (the "Audit Committee Directors") served as members of the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, the Audit Committee Directors failed to adequately review and discuss the Company's Forms 10-K, Forms 10-Q, and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Directors breached their fiduciary duties, are not disinterested, and demand is excused as to them.

293. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to engage in the Diversion Misconduct and to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary

duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. In addition, the Director-Defendants failed to secure and/or disclose any waivers of the Code of Conduct granted by the Board, which constitutes a further violation of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

294. Super Micro has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Super Micro any part of the damages Super Micro suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

295. The acts complained of herein constitute violations of fiduciary duties owed by Super Micro's officers and directors, and these acts are incapable of ratification.

296. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the shareholders of Super Micro. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Super Micro, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

297. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Super Micro to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

298. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIM I

### *Against Defendants Liang, Tuan, T. Liu, Angel, Lin, S. Liu, Liaw, Blair, and Giordano for Violations of Section 14(a) of the Exchange Act*

299. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

300. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

301. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

302. Under the direction and watch of Defendants Liang, Tuan, T. Liu, Angel, Lin, S. Liu, Liaw, Blair, and Giordano, the 2025 and 2026 Proxy Statements failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the descriptions of the Board's and its committees' risk oversight functions, the Board and its committees

were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

303. Defendants Liang, Tuan, T. Liu, Angel, Lin, S. Liu, Liaw, Blair, and Giordano further caused the 2025 and 2026 Proxy Statements to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was engaged in the Diversion Misconduct; (2) a substantial portion of the sales of the Company's servers, which contained U.S. AI technology, were diverted to customers based in China; (3) the foregoing sales and transactions were made in violation of U.S. export control laws and regulations; (4) as a result of the Diversion Misconduct, the Company's sales were artificially inflated at unsustainable numbers; and (5) the Company lacked adequate internal controls to ensure compliance with U.S. export laws. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

304. In the exercise of reasonable care, Defendants Liang, Tuan, T. Liu, Angel, Lin, S. Liu, Liaw, Blair, and Giordano knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement including, but not limited to, the re-election of directors and the approval of the 2025 Amendment to the A&R Equity Plan.

305. As a result of Defendants Liang, Tuan, T. Liu, Angel, Lin, S. Liu, Liaw, Blair, and Giordano causing the 2025 Proxy Statement to be false and misleading, at the 2025 Annual Meeting of the Stockholders, Company shareholders voted, *inter alia*, to approve the 2025 Amendment to the A&R Equity Plan, and to re-elect Defendants Blair and Giordano, thereby allowing them to continue breaching their fiduciary duties to the Company.

306. In the exercise of reasonable care, Defendants Liang, Tuan, T. Liu, Angel, Lin, S. Liu, Liaw, Blair, and Giordano knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2026 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2026 Proxy Statement including, but not limited to, the re-

election of directors and the approval of the 2026 Amendment to the A&R Equity Plan.

307. As a result of Defendants Liang, Tuan, T. Liu, Angel, Lin, S. Liu, Liaw, Blair, and Giordano causing the 2026 Proxy Statement to be false and misleading, at the 2026 Annual Meeting of the Stockholders, Company shareholders voted, *inter alia*, to approve the 2026 Amendment to the A&R Equity Plan, and to re-elect Defendants Liang, Tuan, and T. Liu, thereby allowing them to continue breaching their fiduciary duties to the Company.

308. The Company was damaged as a result of Defendants Liang, Tuan, T. Liu, Angel, Lin, S. Liu, Liaw, Blair, and Giordano's material misrepresentations and omissions in the 2025 and 2026 Proxy Statements.

309. Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

**CLAIM II**

***Against All Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act***

310. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

311. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Super Micro. Not only is Super Micro now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Super Micro by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 4.9 million of its own shares at artificially inflated prices, damaging Super Micro.

312. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

313. The Individual Defendants employed devices, schemes, and artifices to defraud while in

the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Super Micro not misleading.

314. The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though they were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

315. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## CLAIM III

***Against All Individual Defendants for Violations of Section 20(a) of the Exchange Act***

316. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

317. The Individual Defendants, by virtue of their positions with Super Micro and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Super Micro and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Super Micro to engage in the illegal conduct and practices complained of herein.

318. Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

## CLAIM IV

***Against All Individual Defendants for Breach of Fiduciary Duties***

319. Plaintiff incorporates by reference and realleges each and every allegation set forth above,

as though fully set forth herein.

320. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Super Micro's business and affairs.

321. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

322. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Super Micro.

323. In breach of their fiduciary duties owed to Super Micro, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Diversion Misconduct; (2) a substantial portion of the sales of the Company's servers, which contained U.S. AI technology, were diverted to customers based in China; (3) the foregoing sales and transactions were made in violation of U.S. export control laws and regulations; (4) as a result of the Diversion Misconduct, the Company's sales were artificially inflated at unsustainable numbers; and (5) the Company lacked adequate internal controls to ensure compliance with U.S. export laws. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

324. In further breach of their fiduciary duties, the Individual Defendants engaged in and/or caused the Company to engage in the Diversion Misconduct and failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

325. Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

326. In yet further breach of their fiduciary duties, during the Relevant Period, while the

Company's common stock was at artificially inflated prices before the fraud was exposed, the Individual Defendants caused Super Micro to repurchase millions of shares of Company common stock while seven of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of approximately $50.6 million.

327. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Super Micro's securities.

328. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Super Micro's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

329. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

330. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Super Micro has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

331. Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

## CLAIM V

***Against All Individual Defendants for Unjust Enrichment***

332. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

333. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Super Micro.

334. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Super Micro that was tied to the performance or artificially inflated valuation of Super Micro, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

335. Plaintiff, as a shareholder and representative of Super Micro, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, payments to the Individual Defendants, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

336. Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

## CLAIM VI

***Against All Individual Defendants for Abuse of Control***

337. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

338. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Super Micro, for which they are legally responsible.

339. As a direct and proximate result of the Individual Defendants' abuse of control, Super Micro has sustained significant damages. As a result of the misconduct alleged herein, the Individual

Defendants are liable to the Company.

340. Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

**CLAIM VII**

***Against All Individual Defendants for Gross Mismanagement***

341. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

342. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Super Micro in a manner consistent with the operations of a publicly-held corporation.

343. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Super Micro has sustained and will continue to sustain significant damages.

344. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

345. Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

**CLAIM VIII**

***Against All Individual Defendants for Waste of Corporate Assets***

346. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

347. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees to the detriment of the shareholders and the Company.

348. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Super Micro to waste valuable corporate assets while Super Micro suffered from undisclosed issues. The Individual Defendants' misconduct has caused the Company to incur many millions of dollars of legal liability and/or costs to defend against actions and investigations, including the Securities Class Action, to engage in internal

investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

349. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

350. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

351. Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

## CLAIM IX

***Against Defendants Liang, Liaw and Weigand for Contribution Under Sections 10(b) and 21D of the Exchange Act***

352. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

353. Super Micro and Defendants Liang, Liaw and Weigand are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Liang's, Liaw's and Weigand's willful and/or reckless violations of their obligations as officers and/or directors of Super Micro.

354. Defendants Liang, Liaw and Weigand because of their positions of control and authority as officers and/or directors of Super Micro, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Super Micro, including the wrongful acts complained of herein and in the Securities Class Action.

355. Accordingly, Defendants Liang, Liaw and Weigand are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

356. As such, Super Micro is entitled to receive all appropriate contribution or indemnification

from Defendants Liang, Liaw and Weigand.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Super Micro, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Super Micro;

(c) Determining and awarding to Super Micro the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Super Micro and the Individual Defendants to take all necessary actions to reform and improve Super Micro's corporate governance and internal procedures to comply with applicable laws and to protect Super Micro and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Super Micro to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Super Micro restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: October 15, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ *Laurence M. Rosen*______________
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim
Erica L. Stone
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: philkim@rosenlegal.com
Email: estone@rosenlegal.com

*Counsel for Plaintiff*

**THE BROWN LAW FIRM, P.C.**
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: rmoest@gmail.com

*Additional Counsel for Plaintiff*

# VERIFICATION

I, Stanford Chen, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10/11/2026 day of October, 2026.

Signed by:
Stanford Chen
102C94161995456...
Stanford Chen